**BRAINTREE LABORATORIES, INC., Plaintiff,**

v.

**NEPHRO–TECH, INC., et al., Defendants.**

**No. 96–2459–JWL.**

United States District Court, D. Kansas.

July 23, 1999.

Craig T. Kenworthy, Swanson, Midgley, Gangwere, Kitchin & McLarney, LLC, Kansas City, MO, Arthur A. Smith, Jr., Boston, MA, Allen R. Slater, Judge, Olathe, KS, for Braintree Laboratories, Inc., plaintiffs.

Mark E. Brown, Marcia J. Rodgers, Litman, Kraai & Brown, L.L.C., Steven H. Mustoe, Eric C. Carter, Kurlbaum, Stoll, Seaman, Reefer, Suter & Mustoe, P.C., Kansas City, MO, for Nephro–Tech, Inc., G. P. Georges, III, Kimberly J. Georges, defendants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

In this patent infringement case, plaintiff Braintree Laboratories, Inc. seeks to enjoin defendants Nephro–Tech, Inc., G.P. Georges III and Kimberly J. Georges from selling "Calphron," a calcium acetate containing substance, the distribution of which, plaintiff claims, infringes upon its method-of-use patent. Presently before the court is defendants' motion for summary judgment on the issue of validity (doc. 87). For the reasons set forth in detail below, the motion is denied.

## I. Background

Plaintiff Braintree Laboratories, Inc. ("Braintree") is a Massachusetts corporation. Plaintiff is the assignee of United States Patent No. 4,870,105, entitled "Phosphorous Binder," (hereafter the " '105 patent") which was issued by the United States Patent and Trademark Office ("PTO") in favor of John S. Fordtran on September 26, 1989. According to plaintiff's complaint, the patent "claims methods, using calcium acetate, for inhibiting gastrointestinal absorption of phosphorous in an individual." Plaintiff neither discovered, nor holds a patent for, calcium acetate itself. Instead, plaintiff's patent claims only a "method" or "use" of calcium acetate as a phosphorus binder in the lower gastrointestinal tract. Specifically, the claims constituting the '105 patent read as follows:

Claim 1: A method for inhibiting gastrointestinal absorption of phosphorous in an individual, comprising: orally ingesting a quantity of calcium acetate sufficient to bind with phosphorous in the gastrointestinal tract.

Claim 2: The method according to claim 1 wherein the calcium acetate is present in an amount sufficient to provide between 10 to 200 milliequivalents of calcium.

Claim 3: The method according to claim 1 wherein the calcium acetate is in tablet form.

Claim 4: The method according to claim 1 wherein the calcium acetate is in gelatin capsule form.

Claim 5: A method for inhibiting gastrointestinal absorption of phosphorous in an individual, comprising: orally ingesting a quantity of calcium acetate at mealtimes.

Claim 6: The method according to claim 5 wherein the quantity of calcium ace-

tate is present in an amount sufficient to produce between 10–200 milliequivalents of calcium.

Claim 7: The method according to claim 5 wherein the quantity of calcium acetate is in tablet form.

Claim 8: The method according to claim 5 wherein the quantity of calcium acetate is in gelatin capsule form.

Plaintiff markets a drug under the brand name Phos–Lo, which implements plaintiff's patented use of calcium acetate to treat kidney dialysis patients. The calcium in plaintiff's drug binds with excess phosphorus in the lower gastrointestinal tract to form an insoluble salt, thereby facilitating the excretion of phosphorous contained in food. Because diseased kidneys are unable to effectively eliminate phosphorus, a task normally accomplished by healthy kidneys, plaintiff's drug is useful to end-stage renal disease ("ESRD") patients.

Defendant Nephro–Tech, Inc. is a Kansas corporation, owned by defendants G.P. and Kimberly Georges. Defendants market a product under the brand name Calphron, which, according to plaintiff, also contains calcium acetate intended for use as a phosphorus binder. The FDA has not approved defendants' product for marketing as a drug. Calphron is labeled as a "dietary supplement."

On October 18, 1996, plaintiff filed its complaint, alleging that defendants, by marketing Calphron, were infringing on plaintiff's method-of-use patent in violation of 35 U.S.C. § 271. In accordance with 35

U.S.C. §§ 301–307, defendants filed a request with the PTO for reexamination of plaintiff's patent on December 13, 1996. The request was granted by the PTO on the ground that the reexamination request raised "a substantial new question of patentability." 35 U.S.C. § 303. In its memorandum and order dated February 26, 1997, this court granted a stay of judicial proceedings in this action to allow for the resolution of the reexamination request with the PTO. *See* Memorandum & Order dated February 26, 1997 at 17–20. On March 10, 1998, the PTO issued a reexamination certificate, confirming the patentability of each of plaintiff's claims under the '105 patent. As a result of the reexamination certificate's entry, the stay previously entered by this court was lifted on April 15, 1998.[1] Defendants now move for summary judgment, claiming that plaintiff's patent is invalid as anticipated or obvious over the prior art.

## II. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A

---

1. The court notes that counts II and III of plaintiff's original complaint alleged common law unfair competition claims and violations of the Lanham Act, respectively. On February 26, 1997, this court dismissed counts II and III, holding that both counts essentially alleged misbranding in violation of the Federal Drug and Cosmetic Act (FDCA), 21 U.S.C. §§ 301–395, a statute under which no private right of action exists. *See* Memorandum and Order dated February 26, 1997 at 12–16. After the reexamination certificate upholding the validity of the '105 patent issued, plaintiff moved to amend its complaint. With respect to defendants' alleged unlawful

marketing of the Calphron product, the court concluded that the proposed amendment was, essentially, a restatement of the previously-dismissed Lanham Act and unfair competition claims, and accordingly denied as futile that portion of the motion to amend. *See* Memorandum and Order dated November 13, 1998 at 6. To the extent that plaintiff's motion to amend sought to introduce allegations concerning defendants' alleged marketing and distribution of an entirely different product, sold under the tradename Magnebind, the court concluded that such an amendment was inappropriate at that stage of the litigation. *See id.* at 6–7.

fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1). The court further notes that, despite the pervasive issues of fact ordinarily raised in patent infringement suits, "[s]ummary judgment is as appropriate in patent cases as in any other." *Desper Products, Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed.Cir. 1998) (citation omitted). Thus, "[w]hen no issue of material fact is present, . . . courts should not hesitate to avoid an unnecessary trial by proceeding under Fed. R.Civ.P. 56 without regard to the particular type of suit involved." *Chore–Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 778–79 (Fed.Cir.1983).

## III. Discussion

Defendants move for summary judgment on the ground that claim 1 of plaintiff's patent, i.e., the use of calcium acetate to inhibit gastrointestinal phosphate absorption, is anticipated by a prior-art Japanese published patent application (the "Igusa reference," "Igusa application" or, more simply, "Igusa").[2] Defendants further contend that claim 5 of plaintiff's patent, which claims the ingestion of calcium acetate at mealtimes to inhibit gastrointestinal phosphate absorption, is rendered obvious, and therefore unpatentable, over several prior art references including the Igusa application, U.S. Patent No. 4,689,322 (the "Kulbe patent" or "Kulbe reference"), and various other scientific publications concerning the use of calcium carbonate as a phosphate binder, including the "Gonella," "Slatopolsky," and "Makoff" references. Moreover, defendants argue, each of the remaining claims of the '105 patent, which depend from claims 1 and 5, are anticipated or obvious in light of the prior art.

**2.** In its response to defendants' motion for summary judgment, plaintiff takes issue with defendants' characterization of the Igusa reference as the "Igusa patent," explaining that because no patent was issued for the claims contained therein, any reference to Igusa as a "patent" is incorrect. Defendants do not dispute plaintiff's contention with respect to this assertion. The court will, therefore, refer to the Igusa prior art accordingly.

■ At the outset, the court notes that, pursuant to 35 U.S.C. § 282, "[a] patent shall be presumed valid." 35 U.S.C. § 282. With respect to this issue, the parties appear to disagree as to the significance of the fact that, although it was not before the examiner during the original prosecution of the '105 patent, the Igusa application was before the PTO during the reexamination process, and a reexamination certificate issued notwithstanding the information contained therein. Plaintiff contends that, because patents are entitled to a presumption of validity under 35 U.S.C. § 282, this fact weighs against a finding of invalidity. Defendants, on the other hand, argue that the presumption of validity is reduced, if not completely obviated, in this case because, according to defendants, plaintiff misrepresented to the examiner the substance of the claims set forth in the Igusa application during the reexamination process. To the extent that the parties disagree as to whether the prior art was misconstrued by the PTO as a result of plaintiff's alleged mischaracterization of the Igusa reference, a fact issue likely exists. Whatever the outcome of that dispute, however, the court notes that a patent is entitled only to a *presumption* of validity, such that, if defendants were to come forward with sufficient evidence to defeat the presumption, a patent may be declared invalid on the basis of anticipation or obviousness despite the fact that a patent had previously issued.

It is undisputed that, at the time of the claimed invention, it was generally known in the art that calcium salts could be utilized to bind excess phosphates in the body. Defendants contend that, by the '105 patent, Dr. Fordtran "merely recites what has long been known—that all calcium salts bind with phosphorus." According to Braintree, however, Dr. Ford-tran's invention was novel for several reasons. First, plaintiff contends, at the time of Dr. Fordtran's discovery, it was not known in the art that calcium acetate demonstrated the greatest binding affinity to phosphorus. Indeed, according to Dr. Fordtran, prior to his invention, calcium acetate was, to the best of his knowledge, never used as a phosphate binder; instead, aluminum hydroxide and calcium carbonate were widely prescribed as phosphate binders. By the time of Dr. Fortran's discovery, however, the practice of dispensing aluminum hydroxide as a phosphate binder had been largely abandoned because it was shown to be causally-related to various adverse side effects in dialysis patients, including irreversible brain damage, osteoporosis, and anemia. In light of the detrimental effects of aluminum hydroxide, those skilled in the art began to search for an alternative, less toxic phosphate binder suitable for those suffering from the effects of ESRD.

As a result, and as evidenced by the prior art references to which defendants refer the court, prior to Dr. Fordtran's invention, calcium carbonate was the calcium salt "of choice," at least from the perspective of those skilled in the art. Indeed, the Igusa reference itself appears to conclude that, with respect to reducing serum phosphate levels, and among the various calcium salts listed therein, calcium carbonate is "especially safe and effective." Similarly, the Gonella, Slatopolsky, and Makoff references, entitled "Effects of High $CaCO_3$ Supplements on Serum Calcium and Phosphorus in Patients on Regular Hemodialysis Treatment"[3] and "Calcium Carbonate as a Phosphorus Binder in Patients with Chronic Renal Failure Undergoing Dialysis,"[4] and "Chronic Calcium Carbonate Therapy in Uremia,"[5] respec-

3. Gonella, M., et al., *Effects of High $CaCO_3$ Supplements on Serum Calcium and Phosphorus in Patients on Regular Hemodialysis Treatment,* 24 CLINICAL NEPHROLOGY 147–150 (1985).

4. Slatopolsky, et al., *Calcium Carbonate as a Phosphorous Binder in Patients with Chronic* Renal Failure Undergoing Dialysis, 315 NEW ENGLAND JOURNAL OF MEDICINE 157–161 (July 1986).

5. Makoff, et al., *Chronic Calcium Carbonate Therapy in Uremia,* 123 ARCH. INTERN. MED., 15–21 (Jan.1969).

tively, actively promote the use of calcium carbonate as an alternative to aluminum-containing phosphate binders.

Braintree further contends that also unknown by those skilled in the art at the time of Dr. Fordtran's invention was that a calcium compound's phosphate binding affinity was strongly correlated to the compound's solubility in water. At the time of Dr. Fordtran's discovery, the then widely-prescribed calcium carbonate's utility as a phosphate binder was often criticized because, although it is a less toxic substitute for aluminum-containing compounds, calcium carbonate binds phosphate inefficiently. As a result of calcium carbonate's inefficient phosphate binding properties, large daily doses of drug were required, which, in turn, led to the development of hypercalcemia, an undesirably high elevation of calcium levels in the blood. Thus, a viable alternative to the less-than-optimal phosphate binding efficiency of calcium carbonate was sought by those in the field.

According to Drs. Emmett and Fordtran, the discovery of calcium acetate's utility as a phosphate binder was particularly unexpected in light of the then-prevailing view that calcium acetate's high solubility would likely cause it to be rapidly absorbed into the blood, thereby making it more suitable as a calcium supplement, or, in the event that too much calcium was administered, causing hypercalcemia, the precise effect Dr. Fordtran was attempting to avoid. Plaintiff maintains that Dr. Fordtran's suprising discovery that the use of the highly soluble calcium acetate, as opposed the relatively insoluble calcium carbonate, was monumental, because lower dosages of the calcium compound were required, which, in turn, resulted in a decreased risk of hypercalcemia.

Moreover, plaintiff contends, at the time of Dr. Fordtran's invention, it was unknown by those skilled in the art that superior phosphate binding results could be achieved if a quantity of calcium acetate was ingested at mealtimes. According to Dr. Fordtran, because the majority of phosphate binding occurs in the lower gas-

trointestinal tract, he discovered that if a source of free calcium was made rapidly and readily available to bind dietary phosphate shortly after phosphate consumption, then the calcium-phosphate salts formed would precipitate out of solution, so that little calcium or phosphate would be absorbed into the blood. The final element of Dr. Fordtran's invention, then, was his discovery that calcium acetate's high degree of solubility allows it to dissociate quickly in the gut, such that calcium-phosphate binding is exponentially increased when calcium acetate is ingested with food.

## A. Anticipation

 Pursuant to 35 U.S.C. § 102, a patent is invalid if it is anticipated by the prior art. 35 U.S.C. § 102. Whether a prior art reference anticipates a patent claim is a question of fact. *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302 (Fed.Cir.1995). "Anticipation requires identity of the claimed process and a process of the prior art." *Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir.1995). Thus, "the claimed process, including each step thereof, must have been described or embodied, either expressly or inherently, in a single reference." *Id.* For purposes of the anticipation inquiry, the existence of identity between a prior art reference and the claimed invention is gauged not from a layperson's perspective, but is instead judged from the vantage of "a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.Cir.1991). In addition to identity of invention, "the prior art reference must be enabling, thus placing the allegedly disclosed matter in the possession of the public." *Akzo N.V. v. U.S. Int'l. Trade Com'n*, 808 F.2d 1471, 1479 (Fed.Cir.1986).

 Defendants contend that the use of calcium acetate as a phosphate binder was anticipated by the Igusa reference. Spe-

cifically, defendants argue, Igusa's mere disclosure of calcium acetate in its patent application renders the '105 patent anticipatory. Defendants maintain that it is irrelevant that Igusa failed to suggest, recognize, or otherwise predict that calcium acetate is a highly effective phosphate binder. Nor is it of any consequence, defendants explain, that the Igusa claimants reached the erroneous conclusion that, as compared to other calcium salts, calcium carbonate "is especially safe and effective." Instead, defendants argue, "[a] reference is no less anticipatory if, after disclosing the invention, the reference then disparages it." *Celeritas Technologies, Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed.Cir.1998). Defendants further claim that, because calcium acetate was included by the Igusa authors, albeit only as part of an untested list of calcium compounds, and despite the fact that it was not the primary focus of the Igusa reference, calcium acetate's greater phosphate binding affinity is a property inherent to calcium acetate, such that the discovery of calcium acetate's utility as a phosphate binder may not be claimed as novel by plaintiff.

In contrast, plaintiff contends that Igusa's reference to calcium acetate is merely superficial, and should thus be accorded little weight in the anticipation analysis. Specifically, plaintiff claims that the compound was mentioned only as part of a "shopping list" of several calcium salts identified by the Igusa applicants, and that, because Igusa referred generically to virtually all known varieties of calcium salts, if Igusa is deemed to anticipate claim 1 of the '105 patent, then Igusa essentially renders unpatentable any potential method-of-use claims for any identifiable calcium salt. Plaintiff further argues that the Igusa reference is unanticipatory because, although the Igusa application attempts to solve the same problem for which the '105 patent issued, the clear focus of the Igusa reference is to establish calcium carbonate's utility as a phosphate binding compound, as evidenced by the absence of data with respect to any calcium containing compound other than calcium carbonate. Additionally, plaintiff claims, the validity of the information set forth in Igusa is somewhat questionable, especially in light of the application's allegedly erroneous conclusion that calcium carbonate is a more effective phosphate binder than aluminum hydroxide, an assertion that is directly contrary to well-established scientific data, its assertion that calcium acetate is at least slightly acidic in nature, and its inclusion of calcium acetate amongst a list of calcium salts known to be either ineffective, insoluble, or highly toxic to humans. Moreover, plaintiff maintains, even if the Igusa application is deemed to disclose calcium acetate's use as a phosphate binder, it is not enabling. Indeed, plaintiff claims, the mere disclosure of calcium acetate by the Igusa authors is insufficient to enable one skilled in the art to reduce the disclosed invention to practice.

Although the Igusa reference arguably discloses the possible use of calcium acetate as a phosphate binder, the court concludes that plaintiff has demonstrated the existence of a material fact issue with respect to whether the Igusa application anticipated claim 1 of the '105 patent. More specifically, the court finds that plaintiff has set forth sufficient evidence, which, if true, could lead a reasonable fact finder to conclude that the Igusa application's listing of calcium acetate was indeed only as part of a generalized listing of all types of calcium compounds, claiming nothing with respect to calcium acetate itself. Such a conclusion would be reasonable, the court believes, particularly in light of calcium acetate's listing amongst several other calcium compounds that are unsuitable for use as phosphate binders due to their insolubility, inefficient phosphate binding affinity, or high toxicity to humans.

Moreover, the court finds that plaintiff has offered sufficient evidence from which a reasonable inference could be drawn that the Igusa application would be regarded by those in the art as scientifically inaccurate due to its characterization of calcium carbonate's phosphate binding affinity as

superior to aluminum salts, as well as its alleged misrepresentation of calcium acetate as an acidic compound. Similarly, to the extent that calcium carbonate is the only calcium-containing compound for which experimental data was reported by the Igusa reference, the court is persuaded that a reasonable fact finder could conclude that the Igusa application was entirely aimed toward encouraging calcium carbonate use, as opposed to any of the other calcium compounds listed elsewhere in the application.

Additionally, the court concludes that defendants have failed to establish the absence of a material fact issue with respect to the additional requirement that, to be anticipatory, prior art must be enabling. Indeed, it is unclear from the summary judgment record whether, once faced with

Igusa's disclosure of calcium acetate as part of its listing of various categories of calcium salts, one skilled in the art would be compelled to assay the phosphate binding ability of calcium acetate, or would, for that matter, know how to calculate the amount of calcium acetate needed to produce significant phosphate binding results. *See, e.g., Genentech,* 927 F.2d at 1578 ("The need to consider th[e] [enabling] issue, on disputed factual premises, also negates the propriety of the grant of summary judgment based on anticipation.")

In light of the significant disputed factual issues raised by defendants' contention that claim 1 of the '105 patent is invalid for anticipation,[6] the court simply cannot conclude, as a matter of law, that the prior art anticipates the use of calcium acetate in the manner patented by Dr. Fordtran.[7]

---

6. As set forth above, claims 2, 3, and 4 depend from claim 1, further defining the calcium acetate as being present in an amount sufficient to produce or provide between 10 and 200 milliequivalents of calcium, as being in tablet form, and as being in gelatin capsule form, respectively. Because the court concludes that a material fact issue exists with respect to whether the use of calcium acetate as a phosphate binder was anticipated by the prior art, the court likewise finds that summary judgment on the issue of anticipation with respect to these dependent claims is similarly inappropriate.

7. The court notes that defendants devote a considerable portion of their summary judgment papers to comparing the facts of the present case to those with which the Federal Circuit was confronted in *Titanium Metals Corp. of Am. v. Banner,* 778 F.2d 775 (Fed.Cir. 1985). Contrary to defendants' strenuous assertion that *Titanium Metals* controls the outcome of the case at bar, however, the court finds that case distinguishable, at least for purposes of the summary judgment motion currently before the court.

The *Titanium Metals* case followed the PTO's denial of a patent application claiming a metallic compound described by the applicant as "Titanium Alloy." *Id.* at 780. Proceeding on the assumption that his discovery that the alloy exhibited a high degree of corrosion resistance, a property of the metal that was, apparently, previously unknown to those in the metallurgy field, the unsuccessful patentee had attempted to secure a composition-of-matter patent on the metal alloy itself. *Id.* at 781. In holding that the district court

erred in ordering the PTO to issue the patent, the *Titanium Metals* court stated:

> Congress has not seen fit to permit the patenting *of an old alloy,* known to others through a printed publication, by one who has discovered its corrosion resistance or other useful properties, or has found out to what extent one can modify the composition of the alloy without losing such properties.

*Id.* at 782 (emphasis added). Although the precise scope of the claimed invention was obviously somewhat unclear to the district court, *see id.,* it was clear to the appellate court that the application at issue in that case purported to claim patent rights to the *metal alloy itself,* and that the claimant appeared to believe that a mere discovery of a property inherent to a previously-known composition of matter somehow rendered the *metal alloy itself* newly-patentable. *Id.*

Unlike the claimant in *Titanium Metals,* Braintree does not claim a subject matter patent on *calcium acetate itself* by virtue of Dr. Fordtran's discovery that calcium acetate is a particularly effective phosphate binder; instead, the core of plaintiff's claim is that Dr. Fordtran discovered a *method-of-use* for calcium acetate that was not previously known to those skilled in the art at the time of his invention. Thus, the court concludes that, while *Titanium Metals* might be particularly instructive on the issue of anticipation if, in light of his unexpected discovery regarding calcium acetate's previously-unknown exceptional phosphate binding affinity, Dr. Fordtran had attempted to secure a composition-of-matter claim with respect to calcium ace-

## B. Obviousness

■ A patent is invalid for obviousness if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). With respect to the obviousness issue, the court notes that "[t]hroughout the obviousness determination, a patent retains its statutory presumption of validity, *see* 35 U.S.C. § 282, and the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to underlying facts." *Rockwell Intern. Corp. v. U.S.*, 147 F.3d 1358, 1364 (Fed.Cir.1998).

■ It is well-settled that "the ultimate question of obviousness is a question of law." *Richardson–Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed.Cir.1997). Even so, "it is well understood that there are factual issues underlying the ultimate obviousness decision." *Id.* Specifically, the obviousness analysis is based on the following four underlying factual inquiries: "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness." *Kegel Co., Inc. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1430 (Fed.Cir.1997).

Additionally, the court notes that, in its evaluation of the underlying facts, "obviousness" must not be confused with "obvious to try," as the two are distinct concepts. *See, e.g., Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 725 (Fed.Cir.1990). As noted by the Federal Circuit, "[a]n 'obvious-to-try' situation exists when a general disclosure may pique the scientist's curiosity, such that further investigation might be done as a result of the disclosure, but the disclosure itself does not contain a sufficient teaching of how to obtain the desired result, or that the claimed result would be obtained if certain directions were pursued." *Id.* (quoting *In re Eli Lilly & Co.*, 902 F.2d 943, 945 (Fed.Cir.1990)).

In their summary judgment papers, defendants contend that claim 5 of the '105 patent is invalid for obviousness. More specifically, defendants argue that prior art references such as Igusa, Kulbe, Gonella, or Slatopolsky render claim 5's recitation that the calcium acetate should be ingested at mealtimes obvious to one of ordinary skill in the art.

As stated previously, claim 5 is identical to claim 1 except that claim 5 claims a method of ingesting the calcium acetate "at mealtimes." To support their obviousness theory, defendants repeat their assertion that the use of calcium acetate as a phosphate binder was previously disclosed by the prior art.[8] Defendants then refer

---

tate, its utility in the court's determination of the present motion is somewhat limited.

8. Specifically, defendants contend that both the Igusa and Kulbe references disclose the use of calcium acetate to inhibit phosphorus absorption. With respect to Igusa's alleged disclosure of calcium acetate as a phosphate binder, the court refers the parties to its previous discussion of that issue. With respect to the Kulbe reference, the court notes that in their papers, defendants' contention of invalidity for anticipation was limited to a discussion of the Igusa application. Nonetheless, the court has reviewed the Kulbe patent, and finds persuasive plaintiff's argument that a reasonable fact finder could conclude that the Kulbe reference does not anticipate, nor render obvious, the use of calcium acetate as a phosphate binder. Indeed, it appears that the

Kulbe patent primarily touts the use of calcium alginate or calcium pectate as potential phosphate binders in dialysis patients. These calcium compounds are comprised of polymeric salts of plant origin and elemental calcium; for instance, calcium alginate is composed of alginic acid and calcium. Alginic acid and its salts are often "used in the production of ice cream, jams, fruit jellies, cosmetics, creams, edible sausage casings, mayonnaise, pudding, instant soups, bullion [sic] cubes and as dieting aids."

In connection with the experimental data outlined in the Kulbe patent, the "doping" of the experimental gel with calcium acetate is described as a method of creating a calcium surplus. Any reference to calcium acetate notwithstanding, the court finds reasonable plaintiff's interpretation of the Kulbe patent

the court to the Gonella and Slatospolsky references, in which the administration of calcium carbonate just before meals is expressly disclosed. Defendants argue that, when taken together, the prior art existing at the time of Dr. Fordtran's invention renders obvious claim 5 of the '105 patent.

Plaintiff, on the other hand, contends that claim 5 is not rendered obvious over the prior art references cited by defendants. Plaintiff argues that claim 5, in its entirety, describes a method comprising the ingestion *of calcium acetate* at mealtimes. Indeed, plaintiff explains, "the key to the invention is not merely the ingestion with meals, it is the totality of *orally ingesting a quantity of calcium acetate at mealtimes.*" Rather than teaching the use of ingesting calcium acetate at mealtimes, plaintiff argues, each of the prior art references to which defendants refer the court teach the ingestion at mealtimes of *calcium carbonate,* (or calcium alginate in the case of the Kulbe patent). Thus, plaintiff maintains, the use of *calcium acetate* at mealtimes is not rendered obvious by prior art references teaching the use of an entirely different calcium compound.

■ The court concludes that defendant has failed to demonstrate an absence of an issue of material fact with respect to the issue of obviousness. On the contrary, it is quite clear from the parties' differing views of the scope of the prior art, the problems solved thereby, and the differences between the prior art and the '105 patent, that fundamental factual issues remain unresolved at this stage of the litiga-

tion. Furthermore, it is unclear from the record before the court that the prior art teachings to which defendants refer the court render plaintiff's patented use of calcium acetate at mealtimes to inhibit phosphate absorption truly obvious, or merely just "obvious to try."

In any event, the court notes that defendants have wholly failed to address two of the four factors necessary to a proper obviousness determination. Before an ultimate determination with respect to the issue of obviousness may be made, however, the court is charged with considering "all of the evidence under the *Graham* factors." *Richardson–Vicks,* 122 F.3d at 1483 ("all evidence touching the obvious-nonobvious issue [must] be considered before a conclusion is reached on the issue.") In their summary judgment papers, defendants have failed to submit any evidence from which the court could assess, as a matter of law, the relevant level of skill possessed by one in the art, much less evidence sufficient to establish the assertion that, if faced with the relevant prior art, Dr. Fordtran's invention would be obvious to one skilled in the art. Additionally, defendants have failed to address the final factor necessary to a complete obviousness analysis, namely, the existence of "secondary considerations," if any are implicated under the facts and circumstances of this case. Thus, in the absence of such evidence, or a stipulation that none exists or that the facts relevant to the *Graham* factors are undisputed, the court declines to rule, as a matter of law, on the issue of obviousness.[9]

---

as entirely unrelated to Dr. Fordtran's unexpected discovery regarding calcium acetate's high phosphate binding affinity. Because plaintiff has supported its contrary interpretation with sufficient affidavit and deposition evidence, an issue of material fact remains with respect to this issue. Accordingly, to the extent that defendants so move, summary judgment in favor of defendant on the ground that the '105 patent is anticipated by the Kulbe patent is inappropriate.

9. For roughly the same reason that it found summary judgment inappropriate with respect to claims 2, 3, and 4, the court also declines to enter summary judgment on the

basis of obviousness with respect to claims 6, 7, and 8. Claims 6, 7, and 8 depend from claim 5, further defining the calcium acetate to be taken at mealtimes as being present in an amount sufficient to produce or provide between 10 and 200 milliequivalents of calcium, as being in tablet form, and as being in gelatin capsule form, respectively. Because the court concludes that a material fact issue exists with respect to whether the use of calcium acetate as a phosphate binder when ingested at mealtimes was obvious in light of the prior art, the court likewise finds that summary judgment on the issue of obviousness with respect to these dependent claims is similarly inappropriate.

In sum, the court concludes that material fact issues remain for trial with respect to whether plaintiff's patent is invalid for anticipation or obviousness. Accordingly, defendants' motion for summary judgment on the issue of validity is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment on the issue of validity (doc. 87) is **DENIED.**