EON LABS MANUFACTURING, INC., Plaintiff,

v.

WATSON PHARMACEUTICALS, INC., Watson Laboratories, Inc., Oclassen Pharmaceuticals, Inc., Defendants.

No. 00 CIV 5973.

United States District Court, S.D. New York.

Aug. 22, 2001.

**352**

## OPINION AND ORDER

BUCHWALD, District Judge.

This antitrust and deceptive trade practices action was brought by a manufacturer of generic pharmaceuticals, Eon Labs Manufacturing, Inc. ("Eon" or "plaintiff"), against a branded pharmaceuticals manufacturer, Watson Pharmaceuticals, Inc., and two of its research subsidiaries (collectively, "Watson" or "defendant"). Now pending is defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the following reasons, the motion is granted.

## I. BACKGROUND

The allegations of this complaint concern attempts by Watson to maintain the market position of its branded drug Monodox, which contains the active ingredient Doxycycline Monohydrate. As such, understanding the regulatory and economic context of the prescription drug market is of some importance.

### A. Regulatory Framework

The introduction of new pharmaceutical products to the marketplace is governed by the Food, Drug & Cosmetic Act. *See* 21 U.S.C. §§ 301 *et seq.* (1999) ("the Act"). Any company seeking to market a new drug must first receive the approval of the Food and Drug Administration ("FDA") by submitting a New Drug Application ("NDA"). *See id.* § 355(a). The successful initial applicant is often referred to as the "pioneer drug". *See Andrx Pharms., Inc. v. Biovail Corp. Int'l,* 256 F.3d 799, 801 (D.C.Cir.2001). The NDA is a thorough, time-consuming and costly process that must include data from clinical studies that support the proposed drug's safety and effectiveness. *See Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1063 (D.C.Cir.1998).

In 1984, concerned that the NDA was a "cumbersome drug approval process [that] delayed the entry of relatively inexpensive generic drugs into the market place," *Mylan Pharms., Inc. v. Shalala,* 81 F.Supp.2d 30, 32 (D.D.C.2000), Congress enacted the Hatch–Waxman Amendments to the Act. *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 90 Stat. 1585 (1984) (codified in scattered sections of Titles 21, 35, and 42 U.S.C.). The Hatch–Waxman Amendments simplified the approval mechanism for generic versions of already-approved pioneer drugs.[1]

---

**1.** Generic drugs are "versions of brand-name prescription drugs that are often sold without a brand name and that contain the same active ingredients, but not necessarily the same inactive ingredients, as the original." *United States v. Generix Drug Corp.,* 460 U.S.

Under the Amendments, an applicant subsequent to the pioneer applicant no longer needs to file a complete NDA. Rather, an Abbreviated New Drug Application ("ANDA") process was created, by which the generic applicant may rely on the clinical findings of the pioneer drug. *See* 21 U.S.C. § 355(j)(2)(A). An ANDA applicant must principally show that the generic is "bioequivalent" to the branded version; that is, that the "new drug can be expected to have the same therapeutic effect as the listed drug...." *Id.* § 355(j)(2)(A)(iv); *see also id.* §§ (j)(8)(B)(i)-(ii).

A branded drug manufacturer retains some important protections, though, even under the Amendments to the Act. For example, the FDA may not approve an ANDA until five years after the approval of an NDA, even if the pioneer drug manufacturer holds no patent on the active ingredients. *See id.* § 355(c)(3)(D)(ii). Moreover, if the holder of the NDA also holds a patent for the drug's active ingredient, then the protective scheme is both more extensive and more complex. *See* discussion *infra, Andrx*, 256 F.3d at 801–02 (detailing process to secure an ANDA when the pioneer drug is patented). Moreover, other methods employed by branded drug manufacturers to forestall the introduction of generic alternatives have been well-documented. *See, e.g.,* "Generic Drugs: The Stalling Game", *Consumer Reports,* July, 2001, at 36–40 (listing reasons why generic drugs are not produced).

*B. Factual Background* [2]

In 1992, Watson registered the trademark "Monodox" with the United States Patent and Trademark Office under Reg.

No. 1,678,972. (¶ 25). Monodox, which contains the active ingredient doxycycline monohydrate ("doxycycline"), does not enjoy patent protection. Doxycycline is the active ingredient in a number of antibiotic prescription drugs, produced by several manufacturers, and primarily used to treat skin infections. (¶ 24). Watson holds an NDA for a prescription drug containing doxycycline, and indicated for treatment of adult acne and Lyme Disease. (¶ 25).

In early 2000, another pharmaceutical company (unnamed in the complaint but identified by defendant in its moving papers as Halsey Drug Co., Inc.) received approval for an ANDA comprising a generic version of Monodox. (¶ 27) Watson, however, reached an agreement with Halsey to forestall their marketing of the generic doxycycline. In exchange for $30 million in cash and loans, Halsey assigned its rights under the ANDA to Watson. Subsequently, Watson decided not to market a generic alternative. (¶ 28)

Several months later, on June 30, 2000, Eon received approval of an ANDA for a generic version of Monodox. (¶ 29) Watson, in response to this perceived challenge, decided to rush its own generic version of Monodox to market. (¶¶ 30–31) Due to its haste, Watson marketed as generic the identical doxycycline product that was contained in Monodox capsules. (¶ 31) Additionally, the generic packaging included the package inserts which were printed for use in Monodox branded packaging. Thus, as a result of the mistaken inserts, the generic Monodox featured two different NDC numbers, the unique numbers assigned to each drug product. (¶ 33) (The NDC number for generic doxycycline was indicated on the exterior packaging,

453, 455, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983).

2. Unless otherwise indicated, all paragraph references are to the complaint, and all factual allegations are drawn therefrom.

while the NDC number for Monodox was included on the insert.)

Plaintiff alleges that Watson rushed this product to market so as to maintain monopoly power over the supply of doxycycline. The first generic to follow a pioneer drug, Eon alleges, receives a disproportionate advantage in market share due to mandatory generic purchasing rules in state and private health plans. Additionally, the first to market may lock in high-volume, long-term large purchasing contracts with chain retailers. (¶ 32).

Thus, Eon alleges that Watson's behavior was anti-competitive, artificially inflated the prices for generic doxycycline, and deprived Eon of profits it would have garnered had it been first to market. (¶¶ 47–48) Eon further alleges that there is a dangerous probability that Watson will monopolize the United States market for generic doxycycline, and that Watson used deceptive trade practices to achieve market power for its generic product. (¶ 53)

## II. DISCUSSION

Defendant now moves to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted. Dismissal of a complaint is not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In reviewing the allegations for legal sufficiency, we must take all facts alleged in the complaint as true and draw all reasonable inferences in plaintiff's favor. *See Jackson Nat'l. Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699–700 (2d Cir.1994) (Rule 12(b)(6) motion in an antitrust case).

Additionally, the Supreme Court has observed that in antitrust cases in particular, "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). However, the Second Circuit has observed that even in the antitrust context, "conclusory statements [cannot] substitute for minimally sufficient factual allegations." *Furlong v. Long Island College Hosp.*, 710 F.2d 922, 927 (2d Cir.1983); *See also Sutliff, Inc. v. Donovan Cos., Inc.*, 727 F.2d 648, 654 (7th Cir.1984) (Posner, J.) ("The heavy costs of modern federal litigation, especially antitrust litigation ... counsel against launching the parties into pretrial discovery if there is no reasonable prospect that the plaintiff can make out a cause of action from the events narrated in the complaint."); *Anti–Monopoly, Inc. v. Hasbro, Inc.*, No. 94 Civ. 2120, 1995 WL 380300, at \*3 (S.D.N.Y. June 27, 1995) ("conclusory allegations that recite the litany of antitrust will [not] ... suffice" to state a claim).

### A. Antitrust Claims

Plaintiff charges Watson with two types of violations of the antitrust laws. First, Eon alleges a violation of § 1 of the Sherman Antitrust Act. That statute provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is hereby declared to be illegal." 15 U.S.C. § 1. Second, the complaint includes a monopolization claim under § 2 of the Sherman Act, as well as an attempted monopolization claim under that same provision. Third, plaintiff pleads a price discrimination claim under § 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a). We will discuss each set of allegations in turn.

#### 1. Restraint of Trade under Sherman Act § 1

In support of its § 1 claim, Eon argues that the Watson–Halsey agreement

to delay the introduction of the Halsey generic Monodox, in combination with Watson's rush to market with its own generic product, just as Eon received approval for an ANDA, states a claim for an improper restraint of trade. (¶¶ 54–58) (count one). Eon claims that the Watson–Halsey agreement that delayed the production of generic doxycycline has restrained competition and maintained the price of doxycycline at artificially high levels. Plaintiff thus claims damages under §§ 4 and 16 of the Clayton Antitrust Act. *See* 18 U.S.C. §§ 15, 26.

### a.  General Discussion

It is well-settled law that horizontal market allocation agreements, concerted refusals to deal, price-fixing agreements, or boycotts are *per se* violations of the antitrust laws. *See Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *see also National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 99–100, n. 19–20, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (reviewing *per se* violations of § 1).

Agreements between branded pioneer drug manufacturers and generic producers to forestall the introduction of generic drugs are becoming increasingly common as the demand for generic drugs has increased.[3] These sorts of agreements have recently led to a series of lawsuits by consumers and other generic drug producers alleging violations of the antitrust laws. *See e.g., Andrx Pharms., Inc. v. Biovail Corp. Int'l.*, 256 F.3d 799 (D.C.Cir.2001) (plaintiff is generic competitor); *In re Lorazepam & Clorazepate Antitrust Litig,* 202 F.R.D. 12 (D.D.C.2001) (plaintiffs are consumers and health insurers); *In Re Cardizem Antitrust Litig.*, 105 F.Supp.2d 618 (E.D.Mich.2000) (plaintiffs are indirect purchasers of product, including retail pharmacy chains); *Biovail Corp. Int'l. v. Hoechst Aktiengesellschaft*, 49 F.Supp.2d 750 (D.N.J.1999) (plaintiff is generic drug manufacturer).

In each of the above-cited cases, the court found that an agreement between generic and branded pharmaceutical manufacturers preventing the introduction of a generic drug stated a claim under the antitrust laws. *See, e.g., Biovail,* 49 F.Supp.2d at 767 ("[A] reasonable trier of fact could conclude that an agreement between two competitors to delay the applicability of an exclusivity period for the purpose of keeping another competitor out of the market is an unreasonable restraint of trade or a willful intent to maintain or obtain a monopoly.") We agree with Judge Barry's opinion in *Biovail* that the kind of agreement entered into between Watson and Halsey is a classic horizontal restraint of trade that is *per se* anti-competitive under antitrust precedent. *See, e.g., Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,* 65 F.3d 1406 (7th Cir. 1995); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224 (3d Cir.1993); *United States v. Brown,* 936 F.2d 1042, 1045 (9th Cir.1991).[4]

---

**3.** Generic drugs occupied more than 40 per cent of the prescription drug market in 1995, up from 19 per cent in 1983, before the passage of the Hatch–Waxman Amendments. *See Andrx,* 256 F.3d at 801 (citing Congressional Budget Office study).

**4.** The anti-competitive implications of the Watson–Halsey agreement are substantial. By forestalling the introduction of a generic

drug even by several months, Watson was able to continue to reap the more substantial profits from its branded drug. The differential in profit between the branded and generic drugs presumably exceeded the cost of the Halsey buyout, thereby making that transaction an economically desirable one for Watson. Of course, consumers are left without a generic alternative to Monodox, which contributes to the significant cost of prescription

However, there are important factual and regulatory distinctions between this case and those cited above. As will be explained below, those differences lead us to find that despite the existence of a horizontal restraint of trade, Eon suffered no injury-in-fact. Therefore, although the practice of paying a generic drug manufacturer not to market its products is highly suspect under the antitrust laws,[5] a claim for damages under § 4 of the Clayton Act cannot be stated here.

### b. Antitrust Standing and Injury–in–Fact

In an antitrust case, as in any civil action for damages, a plaintiff must demonstrate that a defendant's conduct not only was impermissible but also was injurious to the plaintiff. *See Andrx*, 256 F.3d 799, 806–07 (citing 2 Philip E. Areeda, Herbert Hovenkamp & Roger D. Blair, *Antitrust Law* ¶ 338, at 316 (2d ed.2000)). Proof of damages for recovery under § 4 of the Clayton Act requires "proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (emphasis in original); *see also RSA Media Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 13–14 (1st Cir.2001) (discussing in detail the injury-in-fact requirement for antitrust

cases); *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance*, 123 F.3d 301, 304–05 (5th Cir.1997) (same).

Here, plaintiff points to two general sets of actions by Watson that allegedly caused injury. The first is the agreement with Halsey to prevent Halsey's manufacture of a generic doxycycline product in early 2000. That action, as discussed above, is clearly deleterious to consumer welfare, as well as anti-competitive. However, Eon does not allege that the agreement in any way delayed or prevented it from bringing its *own* generic product to market.[6] Indeed, nowhere in the complaint does Eon state that but for an action by Watson or Halsey, it would have introduced its generic doxycycline product any earlier than June 30, 2000. Thus, although defendants urge dismissal because the complaint states no *antitrust* injury, with respect to these allegations no injury-in-fact is cognizable at all.

This case is therefore distinguishable from the several other generic pharmaceutical cases discussed *supra*, in that the agreement here not to market the generic did not preclude the plaintiff from bringing its own product to market. To highlight why Eon has no injury-in-fact—and thus no standing—it is instructive to compare this case to factually similar ones in which standing has been found to exist. That comparison requires a brief exploration of

---

drugs. Whether this arrangement causes antitrust injury to *Eon*, however, is an altogether separate question.

5. The Supreme Court has been clear on this point: "[t]he central message of the Sherman Act is that a business entity must find new customers and higher profits through internal expansion—that is, by competing successfully rather than by arranging treaties with its competitors." *United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86, 116, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975).

6. Indeed, although we do not go so far as to agree with defendant's argument that the Watson–Halsey agreement had *pro*-competitive effects, it is significant that had Eon's ANDA application followed that agreement more swiftly, it is possible that the agreement might have worked to Eon's benefit. That is, had Eon beat Watson to market, it would have been the first generic entrant because of the Watson buyout of its competitor.

the regulatory scheme applicable to ANDA's.

When a pioneer drug has patent protection (unlike Monodox), an ANDA applicant must certify in one of four ways that the proposed generic equivalent is non-infringing. The fourth of those options (known as "paragraph IV certification") is for the applicant to state that the pioneer drug patent is either invalid or will not be infringed by the generic. *See* 21 U.S.C. § 355(j)(2)(A)(vii). After an applicant makes a paragraph IV certification, the patent holder has a 45–day window during which it may bring suit against the applicant for infringement. If the patent holder does sue, the statute bars the FDA from approving *any* ANDA based on the pioneer drug for thirty months, or until the resolution of the infringement suit, whichever is earlier. If the ANDA applicant is ultimately approved, that applicant is then granted a 180–day exclusivity period before any other equivalent generic may be marketed. *See* 21 U.S.C. § 355(j)(B)(iii).

Thus, in *Biovail*, for example, the plaintiff sought to introduce a generic version of diltiazem, a popular drug used to control high blood pressure. *See* 49 F.Supp.2d at 755–56. However, Biovail was the *second* generic to market, and the first company to market had, as part of its ANDA, made a paragraph IV certification. Within forty-five days thereafter, the patent-holding pioneer developer brought an infringement action against the first generic applicant.

During the course of that lawsuit, two critical events occurred: (1) the FDA tentatively approved the Biovail ANDA, pending the outcome of the legal action, and (2) the pioneer manufacturer agreed to pay the first generic applicant $10 million per quarter until the patent case was fully litigated (including appeals), or the thirty-month period had elapsed, whichever came first. *See id.* at 766–67. This agreement between the pioneer and first generic manufacturers substantially delayed the ability of a second generic manufacturer to enter the market for the drug. Biovail was left on the sidelines of the marketplace because of the collusive manipulation of the regulations. Accordingly, Judge Barry ruled that complaint stated a claim that "defendants are taking advantage of the exclusivity period in an anticompetitive manner." *Id.* at 768.

The alleged injury to the plaintiff in the *Biovail* action stands in stark contrast to the injury alleged here. Because the agreement between Watson and Halsey placed *no* impediments in Eon's path to the marketplace, Eon can plead no injury, and the § 1 claim is therefore dismissed.

### c. Antitrust Injury and Restraint of Trade

■ The other component of the alleged restraint of trade was Watson's rush to market of what Eon in the complaint calls a "faux generic".[7] By hurriedly bringing the generic product to market, in an allegedly mislabeled way, plaintiff argues that

---

**7.** We are cognizant that the Supreme Court has directed that an antitrust plaintiff "should be given the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). However, the complaint itself notes that FDA regulations permit a generic drug and a pioneer branded drug to be made under the same NDA. (¶ 19). Thus, Watson did not need Halsey's ANDA to market generic doxycycline. The Watson–Halsey agreement cannot logically be connected to the rush of the Watson generic to market, because *the marketing of a generic could have been accomplished without the buyout.* Consequently, these allegations stand logically distinct from those discussed in the previous section.

Watson demonstrated an improper intent to freeze other players out of the marketplace. However, even assuming, *arguendo*, that the marketing of this generic drug was somehow improper,[8] the facts as pled in the complaint do not state a claim that includes an antitrust injury.

Demonstrating antitrust injury is essential to recovery under the damage provisions of the Clayton Act. *See Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Once a plaintiff establishes illegal market activity under § 1 of the Sherman Act, he must also "prove more than injury causally linked to an illegal presence in the market." *Id.* Rather, to state a claim a plaintiff must plead antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.*

Even when a *per se* violation of the antitrust laws occurs, a plaintiff is still required to demonstrate antitrust injury as an element of a successful claim. *See Atlantic Richfield Co. v. USA Petroleum*, 495 U.S. 328, 341–45, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("[I]nsofar as the *per se* rule permits the prohibition of efficient practices in the name of simplicity, the need for the antitrust injury requirement is underscored."). As the Supreme Court explained in *Atlantic Richfield*, the antitrust injury requirement:

> ensures that the harm claimed by the plaintiff corresponds for the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from

supporting suits by private plaintiffs .... The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.

*Id.* (emphasis in original). However, Watson's actions, as alleged in the complaint, cannot be said to be competition-reducing.

The gravamen of Eon's complaint is apparent: having expected to reap the benefits of first entry to the generic market for doxycycline, Eon was disappointed to have been bested, and now attributes Watson's unexpectedly swifter entry to foul play. However, the right of first entry into a given market is simply not one protected by the antitrust laws. It is axiomatic that "the antitrust laws protect *competition*, not *competitors*." *Brunswick*, 429 U.S. at 488, 97 S.Ct. 690 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)) (emphasis in original). The fundamental policy underlying the law, of course, is that competition benefits consumer welfare. Here, from the consumer perspective, the critical fact is that a generic drug reached the marketplace, thereby enhancing consumer choice. That the first such generic drug was manufactured by the maker of the branded drug is ultimately immaterial to consumer welfare, when the market stays open to other producers as well (and, in fact, other producers such as Eon do enter the marketplace).[9]

Thus, whatever injury Eon might have suffered from Watson's activities, it cannot be said to be "injury of the type the antitrust laws were intended to prevent ...."

---

8. This assumption almost certainly gives plaintiff's allegations a more expansive reading than even the permissive Rule 12(b)(6) standard requires.

9. As noted earlier, it is significant that because a generic drug entered the market later than it otherwise might have, consumer choice was curtailed. However, Eon does not have standing to recover based on that allegation.

*Brunswick,* 429 U.S. at 489, 97 S.Ct. 690. The injuries Eon complains of are only those resulting from Watson's ability to be the first mover into the generic doxycycline market due to Watson's previous production of Monodox. The complaint features allegations that the first generic entrant into a market tends to get large initial contracts, long-term customer relationships, and benefits from state mandatory generic purchasing regulations. (¶ 21) However, absent proof that Watson barred or delayed Eon's entry through anticompetitive behavior—and such allegations are not made—the claim fails to state an injury of the type the antitrust laws were designed to prevent.[10]

### 2. Monopolization Claims under Sherman Act § 2

Eon's second set of antitrust claims allege that Watson maintains monopoly power in the market for doxycycline prescription drugs, as well as in the sub-market for generic doxycycline drugs. Plaintiff charges that Watson acted with specific intent to engage in exclusionary, predatory and anti-competitive acts, and thus even if not a successful monopolist, Watson should be found liable for attempted monopolization. (¶¶ 59–67) (counts two and three).

To state a claim under § 2 of the Sherman Act, a plaintiff must plead two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

### a. Monopoly Power

■ It is, as an initial matter, doubtful that plaintiff has successfully pled monopoly power.[11] Monopoly power is defined "as the power to control prices in the relevant market or to exclude competitors." *Aspen Skiing Co.,* 472 U.S. at 596, n. 20, 105 S.Ct. 2847. Certainly, until Halsey received its ANDA approval, Watson possessed monopoly power in the doxycycline market, but that power was totally sanctioned by the law. Additionally, there are no allegations in the complaint that Eon seeks to compete in the *branded* doxycycline market, and so plaintiff cannot sustain a monopoly claim on that segment of the market.

The sole remaining question, then, is defendant's market power in the sub-market for generic doxycycline. The com-

---

**10.** It is important to note that it is permissible for Watson to leverage, within limits, the benefits of the natural monopoly conferred by the exclusivity of the NDA for Monodox. *See Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568–69 (2d Cir.1990). That is, simply because it was easier for Watson to enter the market for generic doxycycline, it does not ineluctably follow that the market entry was impermissible under the antitrust laws. Given that Eon was able to independently enter the market at the same time, a claim of "monopoly leveraging" against Watson is not sustainable. *See id.,* at 570–71; *AD/SAT v. Associated Press,* 920 F.Supp. 1287, 1305–06 (S.D.N.Y.1996)

**11.** Another important threshold question to an assessment of monopoly power is the definition of the "relevant market" that is alleged to be monopolized. Although this is often controverted and can even be a jury question, *see Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596, n. 20, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), for the purposes of this motion to dismiss we will assume the relevant market as defined in the complaint. (¶¶ 40–43). Plaintiff asserts that the product market consists of all doxycycline pharmaceutical products, and the relevant sub-market is generic doxycycline prescription drugs. We assume that plaintiff refers only to the market for doxycycline that is indicated for the treatment of adult acne and Lyme Disease.

plaint is altogether vague on this point, which may well be a fatal deficiency. Plaintiff asks us to assume monopoly power based on bare, conclusory allegations, and nothing more. For whatever brief period of time Watson was marketing generic doxycycline prior to Eon's market entry, it is true that Watson possessed monopoly power. However, as discussed above, before market entry Eon could not have sustained an antitrust injury.

More importantly, the complaint does not allege with particularity that Watson maintained monopoly power *after* Eon entered the market. Eon of course cannot allege that Watson's market power prevented Eon from successfully entering the market, since Eon did in fact enter the market when it planned to do so. Moreover, as defendant points out, Eon also cannot plead that Watson's market power prevented Eon from turning a profit on doxycycline. Eon does complain that its revenues were less than what they might otherwise have been—but not that it was losing money because of Watson's allegedly predatory behavior. Additionally, there is no allegation that Watson possessed the market power to control prices in the generic market, thereby forcing Eon to sell its product at a loss. Given the total absence of circumstances that would support an inference of monopoly power, to so conclude would stretch the bounds even of the permissive reading required on a 12(b)(6) motion.[12]

### b. Willful Acquisition and Maintenance

■ However, even if we do assume monopoly power exists, plaintiff has not stated a claim that Watson acted willfully to acquire or maintain that power. The allegations of abuse of monopoly power are comprised of four sets of factual allegations. Plaintiff charges that Watson achieved "willful maintenance" of monopoly power through:

> (1) the ongoing collusive horizontal price-fixing arrangement with Halsey; (2) the faux generic mislabeling scheme targeted specifically at Eon; (3) Watson's exclusionary tactics directed at its buyer network which caused big accounts to boycott or freeze out Eon's generic when it was first introduced; and (4) the recent introduction of another generic by Watson and Halsey as a fighting brand solidifying Defendant's illegal market grab.

Pl. Br., at 15. However, when viewed either individually or collectively, *see City of Mishawaka, Indiana v. American Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980), they fail to state a claim for monopolization. Although it is true that a natural monopolist who "legitimately achieved monopoly may not wield the resulting power to tighten [their] hold on the market," *Northeastern Tel. Co. v. American Tel. & Telegraph Co.*, 651 F.2d 76, 85 (2d Cir. 1981) (citation omitted), the complaint does not state a claim that Watson misused its power. We will address the various allegations in sequence.

First, the allegations regarding the Halsey agreement do not support a § 2 claim. Most importantly, the complaint may make vague allegations that the Watson–Halsey

---

**12.** We are cognizant, of course, that plaintiff has not been afforded any discovery. However, the complaint must at least outline the contours of the monopolization claim. *See Bustop Shelters, Inc. v. Convenience and Safety Corp.*, 521 F.Supp. 989, 997 (S.D.N.Y.1981) ("There is no suggestion of supporting facts, such as the size of the relevant product and geographic markets, the amount of competition foreclosed, and how the acts of the defendants affected that competition. Such conclusory allegations are insufficient in an antitrust complaint.") (granting motion to dismiss).

agreement resulted in price fixing; however, in ¶ 31 the plaintiffs admit that the Watson generic, when introduced, was sold at "a generic price." Additionally, the complaint does not allege that Watson exploited its position as the producer of both the generic and branded drug to extract monopolist's profits from the generic drug. Moreover, as discussed *supra*, the Halsey agreement cannot have caused antitrust injury to plaintiff because it occurred independently of Watson's entry into the generic doxycycline market, and in no way prevented Eon from marketing its own generic.

■ The remaining monopolization allegations relate in some way to to Watson's sale of branded Monodox at generic prices, in generic packaging. The re-labeling and mis-labeling served to improperly inflate the price of branded Monodox, Eon alleges. Plaintiff argues:

> Defendants ... conspired to preserve artificially high prices for Monodox by hiving off a segment of its Monodox inventory, labeling that Monodox segment falsely as a generic, and then selling that "Monodox" as a generic to forestall genuine generic price competition from Eon.

Pl. Br., at 18–19. These arguments are thoroughly unpersuasive. It is totally unclear how, as a matter of economics, artificially high prices for a *branded* drug are maintained by the introduction of a *generic* alternative that is admittedly priced as a generic. (¶ 31). It is further unclear how the generic pricing of Monodox by Watson

forestalled generic price competition from Eon; had Watson priced its generic at an artificially high level due to its natural monopoly, presumably Eon would have gained market share through "genuine generic price competition." [13]

An additional aspect of plaintiff's § 2 claim involves the mislabeling of Watson's generic through the inclusion of the branded Monodox product insert. However, Eon concedes that the two drugs—the branded and generic Watson doxycycline products—contained the same ingredients. Thus, the Second Circuit's discussion of mislabeling in the § 2 context in *National Ass'n of Pharm. Manufs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916–7 (2d Cir.1988), supports defendant's motion to dismiss. In *Ayerst*, the Court of Appeals cited Professors Areeda and Turner approvingly for the proposition that "the courts would be wise to regard misrepresentations as presumptively *de minimis* for § 2 purposes." *Id.*, at 916 (quoting 3 P. Areeda & D. Turner, *Antitrust Law*, ¶ 738a, at 278–79 (1978)). That presumption may only be overcome, the Court held, if, *inter alia*, the representations were "clearly likely to induce reasonable reliance." Here, it is not readily comprehensible why or how consumers or pharmacists would reasonably rely on the title of the product inserts for generic doxycycline, particularly when those inserts were only accessible after opening a properly-labeled package, and the substantive content (aside from the branded name) was entirely accurate. Thus, as a matter of law the § 2 claim cannot be sustained.[14]

**13.** In this regard, plaintiff tries to argue contradictory and untenable positions: On the one hand, Eon maintains that Watson obtained inflated profits from its "faux generic". On the other hand, Eon also alleges predatory behavior, which typically involves a monopolist's underpricing of its product so as to drive out competition. Both violations cannot occur simultaneously, but neither are supported factually by the complaint.

**14.** Plaintiff also argues that the inaccurate product inserts are a violation of the Act and applicable FDA regulations. However, case law is clear on the point that no private right of action exists under the FDC Act. *See, e.g.,*

### 3. Price Discrimination Claim

■ Eon also alleges that Watson violated § 2(a) of the Robinson–Patman Act by engaging in primary-line price discrimination. That act states in relevant part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers or either of them.

15 U.S.C. § 13(a). Plaintiff charges that Monodox was sold at different price levels to similarly situated purchasers of like grade and quality across the United States. (§§ 68—76). Eon alleges a "two-tier, exclusionary predatory pricing scheme." (¶ 75).

To state a claim for price discrimination, a plaintiff must allege two elements: (1) that defendants' prices are below an appropriate measure of defendant's costs, and (2) that there is a dangerous probability the defendant will be able to recoup its investment in below-cost prices. *See Brooke Group, Ltd. v. Brown & William-* *son Tobacco Corp.,* 509 U.S. 209, 221–23, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

Nowhere in ¶¶ 68–76 of the complaint, however, does plaintiff allege that the generic doxycycline was sold *below cost.* For this reason alone, the price discrimination claim must fail. Instead of focusing on defendant's costs, the gist of Eon's complaint is that the generic was sold at substantially reduced *revenues* when compared to the branded drug. Although obviously a true statement, this is not illegal price discrimination.[15]

Additionally, Eon's price discrimination claim once again demonstrates a fundamental misapprehension of the law governing branded and generic pharmaceuticals. The FDC Act permits a branded manufacturer also to sell a generic version of a drug under the same NDA, with the identical ingredients. Therefore, it cannot be price discrimination as a matter of law if the manufacturer chooses to market the product in both fashions, as provided for by the applicable FDA regulations. For both these reasons, the plaintiff's Robinson–Patman Act claim is dismissed.

### B. Lanham Act and Trademark Claims

■ Plaintiff additionally alleges that defendants have violated § 43(a) of the Lanham Act due to their "mislabeling"

---

*Braintree Labs., Inc. v. Nephro–Tech, Inc.,* 58 F.Supp.2d 1293, 1295 n. 1 (D.Kan.1999) (Discussing dismissal of two counts and "holding that both counts essentially alleged misbranding in violation of the Federal Drug and Cosmetic Act (FDCA), 21 U.S.C. §§ 301–395, a statute under which no private right of action exists.").

**15.** Plaintiff's opposition papers to this motion argue that Watson's variable costs are a question for discovery, so that Eon may determine through investigation if the defendant marketed Monodox in a generic form below cost.

However, the complaint does not contain that allegation. And, Eon's argument that this Court should adopt the standard for price discrimination articulated by the Ninth Circuit Court of Appeals, *see Transamerica Computer Co. v. IBM Corp.,* 698 F.2d 1377, 1386–88 (9th Cir.1983), which permits a claim even if a defendant's prices were above total cost, is unavailing in light of Second Circuit precedent. *See Kelco Disposal, Inc. v. Browning–Ferris Indus. of Vt.,* 845 F.2d 404, 407–08 (2d Cir.1988) (discussing predatory pricing in the context of a defendant's *costs.*).

scheme. To recap, the alleged scheme involves selling branded product in generic packaging. Additionally, the scheme is alleged to include the inclusion of the branded NDC number on the generic product insert.

Under the Lanham Act, a plaintiff states a claim if he alleges that a defendant made a material misstatement about a product introduced into commerce that is either literally false or, though literally true, likely to mislead or confuse consumers. *National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir.1997); *See* 15 U.S.C. § 1125(a)(1)(B).

However, this claim must fail as well for many of the same reasons articulated in the discussion of the Sherman Act § 2 claims, *supra*. Most simply, because a manufacturer is permitted by FDC Act to market a generic and branded drug under the same NDA, *see* 21 U.S.C. § 355, it cannot be deception to market the same substance as both a generic and a branded product. Thus, as a matter of law it could not be a "false or misleading description ... or representation of fact" to market the same drug as both a generic and branded item, if the active ingredient is approved through an NDA for the indicated uses. There is no allegation that the generic and branded Watson products were not bioequivalent, which would be the basis for a Lanham Act claim. To the contrary, the gravamen of the complaint is that the substances were *identical*, thereby misleading to consumers. However, it is plain that in any number of economic contexts, the identical substances are lawfully marketed in generic and branded

forms. Thus, plaintiff does not state a claim under the Lanham Act.[16]

■ Plaintiffs also charge that defendants misused the registered trademark "Monodox" in violation of 15 U.S.C. § 1064(3), by fraudulently misrepresenting the source of Watson's generic doxycyline product. Plaintiffs consequently demand the cancellation of the "Monodox" mark.

It is true that "cancellation is the usual statutory remedy for use of a trademark to misrepresent the source of goods," *Lurzer GMBH v. American Showcase, Inc.*, 75 F.Supp.2d 98, 105 (S.D.N.Y.1998), plaintiff has—for the reasons discussed at length, *supra*, not stated a claim for misrepresentation. To the extent that the defendant marketed product as generic that otherwise would have been marketed as branded, it merely acted within the limits afforded by the approved NDA. Thus, the product was not fraudulently misrepresented and cancellation is not an appropriate remedy.

### C. State Law Claims

### 1. Unfair Competition

■ The seventh count of the complaint charges that Watson is liable for the tort of unfair competition under New York State law. Plaintiff plainly fails to state a claim for this common law tort. "The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980). Thus, "[f]ailure to allege with specificity what property has been misappropriated will result in dismissal of

---

**16.** We additionally note that plaintiff's claim does not allege the sort of injury contemplated by the Lanham Act. It is black-letter law that a *prima facie* Lanham Act claim requires "that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Warner–Lambert Co. v. Breathasure*, 204 F.3d 87, 92 (3d Cir.2000). The complaint is devoid of such allegations.

the claim." *Anti–Monopoly, Inc. v. Hasbro, Inc.*, No. 94 Civ.2020, 1995 WL 380300, at *7 (S.D.N.Y. June 27, 1995) (citing *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 75 (2d Cir.1988)).

However, paragraphs 85–87 of the complaint include no specific allegations of what property defendant misappropriated from plaintiff. Indeed, the complaint does not in any way allege that the defendant misappropriated the labors of the plaintiff; to the contrary, plaintiff asserts that defendant improperly capitalized on its *own* research and development that lead to the introduction of Monodox. To the extent that the claim is that defendant improperly denied plaintiff the benefit of first entry into the market for generic doxycycline prescription drugs, that claim must fail for the reasons discussed *supra* section A.1., in the context of antitrust injury.

### 2. Deceptive Trade Practices

Plaintiff also brings a claim under New York General Business Law §§ 349, 350, which prohibit "[d]eceptive acts or practices". As plaintiffs note, these allegations are quite similar in substance to the Lanham Act claim. *See* Pl. Br., at 33.

The New York Court of Appeals recently restated the law under § 349, holding that to state a claim a plaintiff must plead that: (1) defendants engaged in a consumer-oriented act, (2) that the consumer-oriented activity was misleading in a material way, and (3) that plaintiff consequently suffered injury. *See Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000). For the reasons discussed *supra*, the challenged conduct here cannot be considered misleading in a material way, and this claim is likewise dismissed.[17]

Moreover, even assuming consumer confusion, we additionally note that it is difficult to imagine how plaintiff might have suffered the kind of injury contemplated by the New York Legislature when it enacted § 349(h) of the General Business Laws. *See* inquiry. *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 24–25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995) (discussing legislative history) "A prima facie case requires as well a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." *Id.* at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741. Thus, because the complaint does not include allegations of injury to Eon resulting from the alleged "mislabeling" scheme, this count is dismissed as well.

### CONCLUSION

For the foregoing reasons, plaintiff's complaint is dismissed. The Clerk of the Court is respectfully directed to close this case.

**IT IS SO ORDERED.**

---

17. The standards for a claim under § 350 of the General Business Law and the Lanham Act are substantially the same, *see Princeton Graphics Operating, L.P. v. NEC Home Electronics (U.S.A.), Inc.*, 732 F.Supp. 1258, 1266–67 (S.D.N.Y.1990). Thus, our discussion of the Lanham Act claim applies here as well.