SMITHKLINE BEECHAM CORPORA-
TION, SmithKline Beecham, P.L.C.,
Beecham Group, P.L.C. and Glaxos-
mithkline, P.L.C.

v.

APOTEX CORPORATION, Apotex,
Inc. and Torpharm, Inc.

v.

Pentech Pharmaceuticals, Inc. and
Par Pharmaceuticals, Inc.

SmithKline Beecham Corporation,
SmithKline Beecham, P.L.C. and
Beecham Group, P.L.C.

v.

Geneva Pharmaceuticals, Inc. and
Sumika Fine Chemicals Co.,
Ltd.

SmithKline Beecham Corporation,
SmithKline Beecham, P.L.C. and
Beecham Group, P.L.C.

v.

Zenith Goldline Pharmaceuticals, Inc.
and Sumika Fine Chemicals Co.,
Ltd.

SmithKline Beecham Corporation,
SmithKline Beecham, P.L.C. and
Beecham Group, P.L.C.

v.

Alphapharm Pty, Ltd. and Sumika
Fine Chemicals Co., Ltd.

SmithKline Beecham Corporation,
and Beecham Group, P.L.C.

v.

Andrx Pharmaceuticals, Inc. Andrx
Pharmaceuticals, L.L.C. BASF Corpo-
ration, BASF Pharmachemikalien
GMBH & Co. KG and Knoll AG.

SmithKline Beecham Corporation,
and Beecham Group, P.L.C.

v.

Teva Pharmaceuticals USA, Inc.

Civil Action Nos. 99–CV–4304, 00–CV–
4888, 01–CV–0159, 01–CV–2169, 99–CV–
2926, 00–CV–5953, 02–CV–1484, 00–CV–
1393, 00–CV–6464, 01–CV–2602, 01–CV–
1027, 01–CV–3364, 02–CV–8493, 01–CV–
2981, 03–CV–6117, 03–CV–3365.

United States District Court,
E.D. Pennsylvania.

Sept. 29, 2004.

Arthur Makadon, Jamie B. Bischoff, Ballard, Spahr, Andrews and Ingersoll, Philadelphia, PA, for Plaintiff.

Charles S. Marion, Francis P. Devine, III, White and Williams, Alan H. Bernstein, Caesar, Rivise, Bernsttein, Cohen & Pokotilow, Ltd., Philadelphia, PA, Hugh L. Moore, Lord, Bissell, Brook, Chicago, IL, Robert S. Silver, Caesar, Rivise, et al, Philadelphia, PA, William A. Rakoczy, Keith D. Parr, Paul J. Molino, Deanne Mazzochi, Scott Feder, Lord, Bissell & Brook, Chicago, IL, Timothy H. Gilbert Canada, Lenczner, Slaught, Royce, Smith, Griffing, Toronto Ontario, Canada, William J. Castillo, Caesar Rivise Bernstein Cohen Pokotilow, Ltd, Philadelphia, PA, William Andrew Rakoczy, Lord, Bissell & Brook, Chicago, IL, for Defendants.

Jeffrey W. Brennan, Federal Trade Commission, Washington, DC, for Movant.

### MEMORANDUM & ORDER

SURRICK, District Judge.

Presently before the Court are the Motions to Dismiss filed by SmithKline Beecham Corporation, SmithKline Beecham, P.L.C., Beecham Group, P.L.C. and GlaxoSmithKline, P.L.C. ("SmithKline"), (Doc. Nos.112, 124), and the Motion to Dismiss and/or Strike filed by PAR Pharmaceuticals, Inc. and Pentech Pharmaceuticals, Inc. ("PAR/Pentech"), (Doc. No. 117). SmithKline and PAR/Pentech have moved to dismiss certain counterclaims made by Defendants Apotex Corporation, Apotex, Inc., and Torpharm, Inc. ("Torpharm"). After the parties briefed these Motions, Torpharm filed a Motion for Leave to File a Sur–Response, (Doc. No. 140), which SmithKline and PAR/Pentech opposed. Local Rule 7.1(c) provides in part that "[t]he Court may require or permit further briefs if appropriate." Due to the complexity of the issues presented in the Motions to Dismiss, we will grant Torpharm's Motion for Leave. For the following reasons, we will grant in part and deny in part the Motions to Dismiss.

## I. BACKGROUND [1]

These consolidated cases began with claims of patent infringement made by SmithKline. The patents at issue cover certain forms of paroxetine hydrochloride, processes for making paroxetine hydrochloride, and uses of paroxetine hydrochloride. SmithKline manufactures the hemihydrate form of paroxetine hydrochloride, and then tablets and sells that product in the United States under the trademark Paxil® ("Paxil"). Paxil is an anti-depressant drug used to treat a variety of disorders, and is one of the most widely prescribed prescription drugs in the United States. Torpharm and PAR/Pentech are among a number of companies that seek to manufacture and sell a generic form of Paxil, and, as a result, find themselves as defendants in patent infringement suits brought by SmithKline. Torpharm filed an answer denying SmithKline's claims in civil action nos. 99–CV–4304, 00–CV–4888, 01–CV–0159, and 01–CV–2169 and asserting various counterclaims. Some of Torpharm's counterclaims seek declaratory judgments that SmithKline's patents are invalid, unenforceable, improperly listed, and/or not infringed. Torpharm also asserts counterclaims against SmithKline for monopolization, conspiracy to monopolize, attempted monopolization, tortious interference with prospective economic advantages, common law fraud, statutory fraud, and unfair and deceptive trade practices. As explained in more detail below, Torpharm alleges that beginning in 1994, SmithKline began to deliberately pursue a strategy of delaying and destroying generic competition by Torpharm and others in order to maintain and extend SmithKline's monopoly in the market for paroxetine hydrochloride. (Civil Action No. 99–CV–4304, Doc. No. 103 ("Counterclaim") ¶ 1.)

In addition, Torpharm alleges that SmithKline conspired with PAR/Pentech to allow PAR/Pentech to prematurely compete with Torpharm in the generic Paxil market, and thereby punish Torpharm for challenging SmithKline's paroxetine hydrochloride monopoly. In furtherance of this scheme, SmithKline agreed to settle the patent infringement lawsuit it had brought against PAR/Pentech and grant PAR/Pentech a license to sell a generic form of Paxil under certain circumstances. Accordingly, Torpharm brings third-party claims against PAR/Pentech for attempted monopolization and conspiracy to monopolize. SmithKline and PAR/Pentech have moved to dismiss and/or strike Torpharm's antitrust claims to the extent those claims are based on the settlement between Smith-Kline and Par/Pentech, and to dismiss Torpharm's tortious interference claims in their entirety.

### A. Regulatory Framework for FDA Approval of Prescription Drugs

Torpharm is the holder of Abbreviated New Drug Application ("ANDA") No. 75–360 for paroxetine hydrochloride anhydrate, and was the first entity to file an ANDA seeking approval to market a bioequivalent form of Paxil. (*Id.* ¶ 2.) Because Torpharm's status as the first entity to file such an ANDA is so important to its claims, we will briefly discuss the regulatory scheme governing prescription drugs.

The introduction of new prescription drugs to the marketplace is governed by the Food, Drug & Cosmetic Act. *See* 21 U.S.C. §§ 301 et seq. (1999) (the "FDC Act"). Generally, any company seeking to market a new drug must first receive the approval of the Food and Drug Administration ("FDA") by submitting a New

1. Because SmithKline and PAR/Pentech have moved to dismiss certain allegations in Torpharm's counterclaims, we accept Torpharm's allegations as true and draw all reasonable inferences in its favor.

Drug Application ("NDA"). *See id.* § 355(a). The NDA is a thorough, time-consuming, and costly process in part because the application must include data from clinical studies that support the proposed drug's safety and effectiveness. *See Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1063 (D.C.Cir.1998).

Prior to 1984, both brand name and generic drug manufacturers who wished to bring a drug to market were required to file a NDA.[2] Concerned that the NDA was a "cumbersome drug approval process [that] delayed the entry of relatively inexpensive generic drugs into the market place," *Mylan Pharm., Inc. v. Shalala,* 81 F.Supp.2d 30, 32 (D.D.C.2000), Congress enacted the Hatch–Waxman Amendments to the FDC Act. *See* Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 90 Stat. 1585 (1984) (codified in scattered sections of Titles 21, 35, and 42 of the United States Code). The Hatch–Waxman Amendments simplified the approval mechanism for generic versions of drugs that the FDA had approved via the NDA process.

Under the Hatch–Waxman Amendments, a company that wishes to market a generic version of a pioneer drug no longer needs to file a NDA. Instead, Congress created the ANDA process, by which a generic manufacturer can rely on the clinical studies performed by the pioneer drug manufacturer and is not required to prove the safety and effectiveness of its generic drug from scratch. Instead, the generic manufacturer must principally show that its drug is bioequivalent to the pioneer drug for which it will serve as a substitute. *See* 21 U.S.C. § 355(j)(2)(A).

Although Congress was interested in increasing the availability of generic drugs,

it also wanted to protect the rights of those holding patents that claim pioneer drugs. The Hatch–Waxman Amendments, therefore, require that a NDA contain a list of any patents "which claim[ ] the drug ... or which claim[ ] a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1). The FDA maintains a record of the patents that claim approved drugs in its publication entitled *Approved Drug Products with Therapeutic Equivalence,* commonly known as the Orange Book. *See* 21 U.S.C. § 355(j)(7)(A). "[T]he FDA does not take it upon itself to review the patent submissions it receives from NDA applicants and holders in order to determine whether they actually relate to approved drugs and uses.... [Rather,] the FDA simply lists the patent information that it receives from brand manufacturers, expecting those parties to understand and abide by the regulatory mandates." *Purepac Pharm. Co. v. Thompson,* 238 F.Supp.2d 191, 196 (D.D.C.2002). An applicant filing an ANDA must certify whether its proposed generic drug will infringe any of the patents listed in connection with the pioneer drug in the Orange Book and, if not, why not. An applicant filing an ANDA has four certification options. It may certify (1) that the required patent information has not been filed, (2) that the patent has expired, (3) that the patent has not expired but will expire on a particular date, or (4) that the patent is invalid or will not be infringed by the drug for which the applicant seeks approval. *See* 21 U.S.C. § 355(j)(2)(A)(vii). The last

---

**2.** Brand name drugs are also sometimes called "pioneer drugs." Generic drugs are substitutes for pioneer drugs that contain the same active ingredients but not necessarily the same excipients as the pioneer drugs. *See United States v. Generix Drug Corp.,* 460 U.S. 453, 455, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983).

of these options, and the one relevant here, is the so-called Paragraph IV certification.

An applicant who makes a Paragraph IV certification is required to give notice to the holder of the patent alleged to be invalid or not infringed, stating that an ANDA has been filed seeking approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent, and setting forth a detailed statement of the factual and legal basis for the applicant's opinion that the patent is not valid or will not be infringed. *See* 21 U.S.C. §§ 355(b)(3)(B), 355(j)(2)(B)(ii). Upon receiving notice of a Paragraph IV certification, which technically is an act of infringement by the ANDA applicant, *see* 35 U.S.C. § 271(e)(2), the patent owner has forty-five days in which it must initiate a patent infringement suit against the ANDA applicant, or else approval of the ANDA will be effective immediately, 21 U.S.C. § 355(c)(3)(C). If the patent owner brings such a suit, then approval of the ANDA may not be granted until the court rules that the patent is invalid or not infringed or until the expiration of (in general) thirty months, whichever first occurs. *Id.* If the NDA holder lists additional patents in the Orange Book in connection with its approved drug while an ANDA for that drug is pending, the ANDA applicant is required to file an additional Paragraph IV certification with respect to each newly-listed patent. Under the law in effect when these cases were filed, a NDA holder could trigger multiple thirty-month stays by listing additional patents in the Orange Book in connection with its approved drug while an ANDA was pending, and then filing additional patent infringement suits

against the ANDA applicant. *See Apotex, Inc. v. Thompson,* 347 F.3d 1335, 1339 (Fed.Cir.2003). Each additional patent infringement suit would reset the thirty-month stay period. *See Xechem, Inc. v. Bristol–Myers Squibb Co.,* 372 F.3d 899, 900 (7th Cir.2004).[3]

The Hatch–Waxman Amendments confer certain benefits on the first entity to file an ANDA with a Paragraph IV certification. Any subsequent ANDA that contains a Paragraph IV certification shall not be made effective before 180 days after either (1) the first commercial marketing of the drug under the previous ANDA, or (2) the date of a decision of a court holding the patent that is the subject of the previous certification invalid or not infringed, whichever is earlier. *See* 21 U.S.C. § 355(j)(5)(B)(iv). In other words, the Hatch–Waxman Amendments give the first entity to file an ANDA with a Paragraph IV certification a 180–day exclusivity period in which to market its generic drug without competition from other ANDA applicants. *See Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1064–65 (D.C.Cir.1998) (describing exclusivity period). However, the FDC Act does not restrict a non-ANDA applicant from marketing a FDA-approved drug under a generic label during the so-called 180–day exclusivity period. *Cf.* 21 U.S.C. § 355(j)(5)(B)(iv); 35 U.S.C. § 261; *Eon Labs Mfg., Inc. v. Watson Pharms., Inc.,* 164 F.Supp.2d 350, 362 (S.D.N.Y.2001) ("The FDC Act permits a branded manufacturer also to sell a generic version of a drug under the same NDA, with the identical ingredients.").

---

**3.** On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.L. No. 108–173, 117 Stat.2066 (2003), which amended the FDC Act and eliminated the ability of NDA holders to obtain multiple thirty-month stays of ANDAs filed in connection with their approved drugs. *See* 21 U.S.C. § 355(c)(3)(C).

## B. Background of the Paxil Patents

Paroxetine and its pharmaceutically acceptable salts, such as paroxetine hydrochloride, are claimed by U.S. Patent No. 4,007,196 (the "'196 Patent"). (Counterclaim ¶ 98.) In 1980, SmithKline obtained the patent rights to paroxetine from the owner of the '196 Patent, a company called A/S Ferrosan. (*Id.* ¶¶ 30, 98.) Because the '196 Patent was due to expire in 1992, SmithKline attempted to discover a new paroxetine molecule to patent. (*Id.* ¶¶ 30, 102.) This involved attempting to find a new way to synthesize paroxetine and its salts. (*Id.* ¶ 30.) By obtaining patents on new forms of paroxetine, SmithKline believed that it could prevent generic drug manufacturers—like Torpharm—from marketing a bioequivalent paroxetine product. (*Id.* ¶ 102.)

■ In 1985, SmithKline claimed to have discovered a new crystalline form of paroxetine hydrochloride—crystalline paroxetine hydrochloride hemihydrate—and filed a British patent application for the hemihydrate form. According to Torpharm, SmithKline disclosed, and left unpatented, several other forms of paroxetine hydrochloride: an amorphous form; an isopropyl alcohol solvate form; and an anhydrate form.[4] (*Id.* ¶ 32.) In January, 1988, SmithKline obtained U.S. Patent No. 4,721,723 (the "'723 Patent"), which claims paroxetine hydrochloride hemihydrate, as well as several tests used to determine the presence of the hemihydrate form. (*Id.* ¶¶ 33, 105.)

In December, 1992, the FDA approved SmithKline's NDA No. 20–031 for paroxetine hydrochloride hemihydrate. (*Id.* ¶ 94.) The FDA approved paroxetine hydrochloride hemihydrate for, among other things, use in the treatment of depression.

(*Id.* ¶ 96.) By then, the '196 Patent on the basic paroxetine molecule had expired. The anhydrate, isopropyl alcohol solvate, and amorphous forms of paroxetine had been disclosed and unpatented. Thus, at the time SmithKline's NDA No. 20–031 was approved, the only form of paroxetine claimed by SmithKline's U.S. patents was the paroxetine hydrochloride hemihydrate form claimed by the '723 Patent. (*Id.* ¶ 34.) After NDA No. 20–031 was approved, SmithKline began selling paroxetine hydrochloride hemihydrate under the trade name Paxil. (*Id.* ¶ 35.)

## C. SmithKline Allegedly Begins Its Anti–Competitive Scheme

Shortly after SmithKline began selling Paxil, it allegedly prepared a Paxil "Post Patent Strategy," which had one key objective: "Raising barriers to entry for generic competitors." (*Id.* ¶ 35.) As part of the strategy, SmithKline intended to aggressively patent all forms, dosages, uses, and processes related to paroxetine hydrochloride. (*Id.* ¶ 37.) One area of concern for SmithKline was that the anhydrate form of paroxetine hydrochloride was not patented. The '723 Patent claimed only the hemihydrate form. Thus, generic drug manufacturers could freely produce the anhydrate form after the basic paroxetine patent—the '196 Patent—expired in 1992. SmithKline discovered that it was possible to produce a sample of the anhydrate form that contained undetectable levels of the hemihydrate form. Thus, SmithKline believed that generic drug manufacturers could produce paroxetine hydrochloride anhydrate without infringing SmithKline's '723 Patent. (*Id.* ¶ 40.)

---

4. A condition for patentability is that the invention must not have been disclosed in a printed publication more than one year prior to the date of the application for the patent in the United States. 35 U.S.C. § 102. Thus, if an entity discloses an invention and does not apply for a patent on it within one year, that invention is no longer patentable.

In the 1990's, Torpharm set about producing a generic form of Paxil. Torpharm intended to produce the anhydrate form of paroxetine hydrochloride, so as not to infringe SmithKline's '723 Patent. (*Id.* ¶ 42.) Torpharm conducted the bioequivalency studies needed to submit an ANDA for paroxetine hydrochloride anhydrate, and, in 1998, filed its ANDA for paroxetine hydrochloride anhydrate, relying on the safety and effectiveness studies that SmithKline submitted with NDA No. 20–031. (*Id.* ¶ 43.) Torpharm was the first entity to file an ANDA for paroxetine hydrochloride anhydrate. In connection with its ANDA, Torpharm reviewed the Orange Book to determine which patents were listed there in connection with NDA No. 20–031. At the time, the '723 Patent was the only such patent listed in the Orange Book. (*Id.* ¶ 109.) Thus, Torpharm filed a Paragraph IV certification stating that its paroxetine hydrochloride anhydrate product would not infringe SmithKline's '723 Patent. (*Id.* ¶ 44.)

When SmithKline received notice of Torpharm's ANDA and Paragraph IV certification, it sued Torpharm in the United States District Court for the Northern District of Illinois for infringement of its '723 Patent. (*Id.* ¶ 48.) Torpharm alleges that SmithKline's patent infringement suit was initiated in bad faith, in order to prevent generic competition for Paxil and preserve SmithKline's monopoly. (*Id.* ¶ 53.) According to Torpharm, SmithKline knew that it was possible to make a sample of paroxetine hydrochloride anhydrate that did not contain a detectable amount of the hemihydrate form, particularly when the tests disclosed in the '723 Patent were used to test the sample. (*Id.* ¶ 46.) SmithKline also knew that Torpharm's product, paroxetine hydrochloride anhydrate, would not infringe the '723 Patent. (*Id.* ¶ 50.) Nevertheless, SmithKline filed a patent infringement suit against Torpharm. (*Id.* ¶ 51.) SmithKline's suit

stayed the FDA's approval of Torpharm's ANDA, and therefore prevented Torpharm from marketing a generic alternative to Paxil. (*Id.* ¶ 60.) Under the FDC Act, the FDA could not approve Torpharm's ANDA until the court ruled that SmithKline's '723 Patent was invalid or not infringed, or until the expiration of thirty months, whichever first occurred. 21 U.S.C. § 355(c)(3)(C). Had SmithKline not sued Torpharm for patent infringement, Torpharm likely would have been able to market its paroxetine hydrochloride anhydrate product beginning in November, 2001. (Counterclaim ¶¶ 61–63.)

### D. SmithKline Allegedly Expands its Anti–Competitive Scheme

SmithKline expanded its anti-competitive scheme after suing Torpharm for infringement of the '723 Patent. According to Torpharm, SmithKline fraudulently and/or improperly obtained ten additional paroxetine-related patents, enabling it to further delay Torpharm and other generic drug manufacturers from producing and selling a generic form of Paxil. (*Id.* ¶ 64.) SmithKline caused the FDA to list these newly-obtained patents in the Orange Book in connection with Paxil. (*E.g., id.* ¶¶ 114–120.) Each time SmithKline listed a patent in the Orange Book in connection with Paxil, Torpharm was forced to amend its ANDA by submitting another Paragraph IV certification for the newly-listed patent. Each additional Paragraph IV certification allowed SmithKline to file another patent infringement suit against Torpharm, and obtain an additional stay of the approval of Torpharm's ANDA of up to thirty months. (*Id.* ¶¶ 102–103.) SmithKline has filed patent infringement suits against Torpharm in this court based on four of those newly-listed patents. According to Torpharm, all of these suits are objectively and subjectively baseless.

### E. The Settlement Between Smith-Kline and PAR/Pentech

The last of the thirty-month stays of Torpharm's ANDA was due to expire on September 19, 2003. (*Id.* ¶ 302.) Thus, by April, 2003, SmithKline anticipated that Torpharm would within a few months begin marketing a generic form of Paxil. (*Id.* ¶ 309.) SmithKline also knew that, as the first entity to file an ANDA for Paxil, Torpharm was entitled under the FDC Act to a 180–day exclusivity period in which to market its generic form of Paxil free from competition from other ANDA applicants. As a result, in order to punish Torpharm for challenging SmithKline's paroxetine monopoly, SmithKline and PAR/Pentech allegedly conspired to destroy the value of Torpharm's 180–day exclusivity period. (*Id.* ¶ 310.)

PAR/Pentech, like Torpharm, is a generic drug manufacturer that filed an ANDA seeking approval to market a generic form of Paxil. In response to PAR/Pentech's ANDA, SmithKline sued PAR/Pentech in the Northern District of Illinois for patent infringement, thereby staying approval of its ANDA. On April 18, 2003, SmithKline and PAR/Pentech entered into a series of agreements (the "Settlement"), the purpose of which was to settle that lawsuit and grant PAR/Pentech a license to market a generic form of Paxil under certain circumstances. (*Id.* ¶ 329.) Torpharm calls the drug covered by the Settlement a "pseudo-generic" because the Settlement grants PAR/Pentech a license to sell paroxetine hydrochloride hemihydrate—the same drug covered by SmithKline's NDA—albeit under a generic label.[5] (*Id.* ¶ 334.) Under the Settlement, SmithKline will permit PAR/Pentech to sell paroxetine hydrochloride hemihydrate under a generic label in Puerto Rico. If another generic drug manufacturer, such as Torpharm, be-gins selling a generic form of Paxil in the United States, PAR/Pentech would then be permitted to sell paroxetine hydrochloride hemihydrate under a generic label in the rest of the United States. If that other generic drug manufacturer is required to stop selling its generic form of Paxil for any reason, PAR/Pentech would also have to stop selling its generic form of Paxil in the United States. (*Id.* ¶ 316.) The Settlement effectively allows PAR/Pentech to compete with Torpharm in the generic Paxil market during Torpharm's 180–day period of market exclusivity, thereby denying Torpharm the benefits it expected to gain from that period. By depriving Torpharm of the value of its expected 180–day period of market exclusivity, the Settlement will discourage it and other generic drug manufacturers from filing ANDAs and challenging weak and invalid patents. (*Id.* ¶ 318.) According to Torpharm, SmithKline and PAR/Pentech entered into the Settlement with the purpose of punishing Torpharm for challenging SmithKline's Paxil monopoly and to monopolize the market for paroxetine hydrochloride. (*Id.* ¶¶ 334–35.) If Torpharm is able to exclusively market a generic form of Paxil for 180 days—i.e., without competition from PAR/Pentech—it estimates that it would be able to make nearly $500 million in sales of its product. (*Id.* ¶ 341.)

### F. SmithKline's and PAR/Pentech's Motions to Dismiss

SmithKline and PAR/Pentech have moved to dismiss and/or strike all of Torpharm's antitrust claims to the extent those claims are based on the Settlement. SmithKline and PAR/Pentech argue that those claims should be dismissed because Torpharm fails to allege that it suffered an antitrust injury flowing from the Settle-

---

**5.** In contrast, Torpharm seeks to market a generic form of Paxil that it bioequivalent, but is composed of paroxetine hydrochloride anyhydrate instead of the hemihydrate form.

ment. SmithKline and PAR/Pentech have also moved to dismiss Torpharm's tortious interference claims, arguing that those claims should be dismissed because Torpharm fails to allege a prospective contractual relationship between it and a third party, and that the actions of SmithKline and PAR/Pentech are protected by the competitor's privilege.

## II. ANALYSIS[6]

### A. Has Torpharm Pled an Antitrust Injury?

■ An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). As the Court of Appeals for the Third Circuit has explained, the requirement that a plaintiff allege "[a]ntitrust injury is a necessary but insufficient condition of antitrust standing." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 265 (3d Cir.1998) (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997)).[7] Although "the existence of antitrust injury is not typically resolved

through motions to dismiss," *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir.1997) (citing *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir.1995)), courts can and do dismiss complaints that fail to allege an antitrust injury. *See, e.g., City of Pittsburgh*, 147 F.3d at 268; *Schuylkill Energy*, 113 F.3d at 417–19.

Torpharm raises three claims under the Sherman Act. Its Fifth Cause of Action is against SmithKline for monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. According to Torpharm, SmithKline engaged in a number of anticompetitive acts, including entering into the Settlement with the specific intent to monopolize the market for paroxetine hydrochloride. According to Torpharm, the Settlement poses a dangerous probability that such monopolization will succeed. (Counterclaim ¶ 408.) Torpharm's Sixth Cause of Action is against SmithKline and PAR/Pentech for entering into the Settlement and thereby conspiring to monopolize the market for paroextine hydrochloride and restrain trade of paroxetine hydrochloride in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. (*Id.* ¶¶ 414–15.) Torpharm's Seventh Cause of

---

6. When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), we must accept as true all facts alleged in the complaint and view all reasonable inferences to be drawn therefrom in favor of the non-moving party. *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990). "However, we are not required to accept legal conclusions alleged or inferred in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). A complaint will withstand a motion to dismiss if the material allegations and inferences drawn from those allegations provide a basis for recovery. *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 124–125 (3d Cir.1998).

7. The Third Circuit has set forth the following as the relevant factors in an antitrust standing challenge:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 740–41 (3d Cir. 2004). Alleging antitrust injury, however, remains a prerequisite for antitrust plaintiffs. *Id.* at 741 n. 10.

Action is against SmithKline and PAR/Pentech for attempted monopolization. (*Id.* ¶ 418.) We will assess each of these claims to determine whether any of them allege an antitrust injury flowing from the Settlement.

We begin our analysis by examining the Supreme Court's decision in *Brunswick.* In *Brunswick,* several operators of bowling alleys sued Brunswick, who was one of the two largest bowling equipment manufacturers in the United States. Brunswick sold most of its equipment to operators of bowling alleys for secured credit. When the bowling industry went into a decline, many of Brunswick's customers found themselves unable to make their loan payments to Brunswick. Repossessions rose dramatically, but Brunswick had only limited success in selling and leasing the repossessed equipment. As a result, Brunswick began acquiring and operating defaulting bowling centers when the equipment could not be resold and a positive cash flow could be expected from the operating of the facility. These acquisitions made Brunswick by far the largest operator of bowling centers in the United States, although it controlled only two percent of such centers. *Id.* at 479–80, 97 S.Ct. 690.

Plaintiffs sued Brunswick after it acquired six failing bowling centers in the markets in which plaintiffs operated. According to plaintiffs, these acquisitions tended to create a monopoly and substantially lessen competition by driving smaller bowling center operators out of business. Plaintiffs claimed their damages were the profits they would have realized had Brunswick allowed the centers to close. The case proceeded to trial, and the jury returned a verdict for plaintiffs. The Third Circuit reversed, finding error in the jury instructions. Both parties appealed to the Supreme Court, which accepted certiorari to answer the following question:

"whether antitrust damages are available where the sole injury alleged is that competitors were continued in business, thereby denying [plaintiffs] an anticipated increase in market shares." *Id.* at 484, 97 S.Ct. 690.

The Supreme Court found that because plaintiffs' loss of expected income would have been the same had the failing bowling centers obtained refinancing or been acquired by other, smaller entities, the plaintiffs' "injury was not of 'the type that the statute was intended to forestall.'" *Id.* at 488, 97 S.Ct. 690 (quoting *Wyandotte Transp. Co. v. United States,* 389 U.S. 191, 202, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967)). Moreover, the Supreme Court held that the antitrust laws do not allow recovery of profits lost as a result of increased competition:

> But the antitrust laws are not merely indifferent to the injury claimed here. At base, respondents complaint that by acquiring the failing centers petitioner preserved competition, thereby depriving respondents of the benefits of increased concentration. The damages respondents obtained are designed to provide them with the profits they would have realized had competition been reduced. The antitrust laws, however, were enacted for "the protection of competition not competitors," *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). It is inimical to the purposes of these laws to award damages for the type of injury claimed here.

*Brunswick,* 429 U.S. at 488, 97 S.Ct. 690; *see also Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (holding that the antitrust injury requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first

place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief").

■ Although *Brunswick* was not decided in the context of a motion to dismiss, courts have applied the Supreme Court's reasoning to dismiss complaints at the pleading stage when the only damages alleged were profits lost as a result of increased competition. *See, e.g., Midwest Gas Servs., Inc. v. Indiana Gas Co., Inc.,* 317 F.3d 703, 713 (7th Cir.2003) (affirming dismissal of an antitrust complaint in part because "[w]hile [plaintiffs] may have lost profits as a result of [defendant's] sales, failure to realize expected profits due to competition is not an antitrust injury, because 'a plaintiff can only recover if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.' ") (quoting *Atlantic Richfield,* 495 U.S. at 344, 110 S.Ct. 1884). In fact, a federal district court applied the reasoning in *Brunswick* to dismiss antitrust claims very similar to the claims raised by Torpharm. In *Eon Labs,* the defendant, Watson Pharmaceuticals, Inc. ("Watson") held an NDA for a prescription drug sold under the trademark "Monodox." 164 F.Supp.2d at 353. The plaintiff, Eon Labs Manufacturing, Inc. ("Eon"), received approval from the FDA for its ANDA for a generic version of Monodox. In response to Eon's ANDA, Watson allegedly decided to rush its own generic version of Monodox to market. Eon alleged that Watson took this action in order to maintain its monopoly in the market for Monodox and its generic alternatives. As result, Eon argued it was deprived of the advantages it hoped to realize by being the first entity to market a generic version of Monodox. "Eon allege[d] that Watson's behavior was anti-competitive, artificially inflated the profits for generic [Monodox], and deprived Eon of profits it would have garnered had it been the first to market." *Id.*

at 353–54. In addition, Eon alleged that there was "a dangerous probability that Watson will monopolize the United States market for generic [Monodox]...." *Id.* at 354. The district court dismissed these claims because Eon failed to allege an antitrust injury:

> The gravamen of Eon's complaint is apparent: having expected to reap the benefits of first entry to the generic market for [Monodox], Eon was disappointed to have been bested, and now attributes Watson's unexpectedly swifter entry to foul play. However, the right of first entry into a given market is simply not one protected by the antitrust laws. It is axiomatic that "the antitrust laws protect *competition,* not *competitors.*" [*Brunswick* ], 429 U.S. at 488, 97 S.Ct. 690 (quoting *Brown Shoe Co.,* 370 U.S. at 320, 82 S.Ct. 1502) (emphasis in original). The fundamental policy underlying the law, of course, is that competition benefits consumer welfare. Here, from the consumer perspective, the critical fact is that a generic drug reached the marketplace, thereby enhancing consumer choice. That the first such generic drug was manufactured by the maker of the branded drug is ultimately immaterial to consumer welfare, when the market stays open to other producers as well (and, in fact, other producers such as Eon do enter the marketplace).

*Id.* at 358. We are persuaded that the foregoing analysis from *Eon Labs* applies here. According to Torpharm, when SmithKline and PAR/Pentech entered into the Settlement, Torpharm was denied certain benefits it expected to reap as the first entity to market a generic form of Paxil. Such an injury, resulting from increased competition, is not an antitrust injury.

Torpharm attempts to distinguish *Eon Labs*. It points to language from that case where the district court seemed to condition its decision on the fact that Eon did not allege that "Watson barred or delayed Eon's entry [into the Monodox market] through anticompetitive behavior...." *Id.* at 359. Here, according to Torpharm, SmithKline repeatedly attempted to delay Torpharm's entry into the generic Paxil market, in part by procuring fraudulent patents, improperly listing those patents, and engaging in sham patent infringement litigation. While we are required to accept these allegations as true for the purpose of these motions to dismiss, doing so does not bring the Court any closer to finding that the Settlement produced an antitrust injury. The allegations that SmithKline engaged in anticompetitive conduct by procuring fraudulent patents, improperly listing those patents, and engaging in sham patent infringement litigation are not under attack by these motions. The issue before the Court is whether the Settlement caused Torpharm to suffer an antitrust injury. As we have explained, it seems clear that the Settlement actually *increased* competition in the market for paroxetine hydrochloride. Accordingly, we fail to see how the Settlement caused Torpharm to suffer an antitrust injury.[8]

In support of its contention that it has suffered an antitrust injury. Torpharm relies on a number of cases that hold that actions that "harm the competitive *process*" produce an antitrust injury. *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C.Cir.2001). According to Torpharm, the Settlement harms the competitive process for gaining FDA approval of new prescription drugs by discouraging Torpharm and other generic drug manufacturers from filing ANDAs that challenge weak and invalid patents. However, none of the cases cited by Torpharm allowed a plaintiff to recover profits lost solely as a result of increased competition, something the Supreme Court forbade in *Brunswick*. Instead, they all involved defendants that harmed the competitive process by engaging in exclusionary and/or anticompetitive conduct. For example, in *Microsoft*, the defendant, while possessing monopoly power, engaged in a variety of anticompetitive conduct designed to preserve its monopoly, including insisting on various restrictions in its software licensing agreements, integrating various components of its software, and entering into exclusionary agreements with Internet Access Providers. 253 F.3d at 64, 67, 71. In *Sunshine Cellular v. Vanguard Cellular Sys., Inc.*, one cellular telephone provider allegedly refused to enter into a roaming agreement with another cellular provider in an attempt to force the second cellular provider out of business. 810 F.Supp. 486, 489–90 (S.D.N.Y.1992). In *Sony Elecs., Inc. v. Soundview Techs., Inc.*, a group of television manufacturers alleged-

---

8. Torpharm also argues that *Eon Labs* is distinguishable on the grounds that, unlike Torpharm, the plaintiff in that case was not entitled to a 180–day period of market exclusivity as the first entity to file an ANDA. We fail to see how that distinction makes a difference. The court in *Eon Labs* applied the reasoning from *Brunswick* and held that "the right of first entry into a given market is simply not one protected by the antitrust laws," a holding that seems to apply here. In any event, as we have explained, Torpharm did not have the "right" under the FDC Act to be the first entity to market a generic form of Paxil. The FDC Act only provides for a 180–day delay in the approval of other ANDAs, 21 U.S.C. § 355(j)(5)(B)(iv), and permits a "branded manufacturer also to sell a generic version of a drug under the same NDA, with identical ingredients," *Eon Labs*, 164 F.Supp.2d at 362. Thus, nothing in the FDC Act prevented SmithKline from licensing to PAR/Pentech the right to sell paroxetine hydrochloride hemihydrate under a generic label prior to the expiration of Torpharm's so-called 180–day exclusivity period.

ly conspired to fix the price of a license for the plaintiff's patent, giving rise to an antitrust injury even though the agreement would have benefitted consumers. 157 F.Supp.2d 180, 182–84 (D.Conn.2001). In *Woods Exploration & Producing Co. v. Aluminum Co. of Am.*, the defendants refused to deal with the plaintiff in an attempt to force it out of business. 438 F.2d 1286, 1300–03 (5th Cir.1971). Finally, in *LePage's Inc. v. 3M*, the defendant engaged in a number of exclusionary acts designed to induce its customers to deal with it rather than the plaintiff. 324 F.3d 141, 158 (3d Cir.2003). These cases are completely dissimilar from the present one, in which Torpharm claims as damages the profits lost when PAR/Pentech was allowed to compete with it in the market for generic Paxil. Accordingly, we are not persuaded that Torpharm has alleged a harm to the competitive process.[9]

### B. The Impact of *Continental Ore*

Torpharm argues that we should not dismiss its antitrust claims to the extent they are based on the Settlement because doing so would run afoul of the well-recognized rule in antitrust cases that courts should assess the anticompetitive effect of an antitrust scheme as a whole, rather than the effects of each of a scheme's constituent parts. According to Torpharm, SmithKline engaged in a scheme to extend its monopoly in the market for paroxetine hydrochloride and prevent Torpharm from entering that market. Part of this scheme involved a conspiracy between SmithKline and PAR/Pentech to deny Torpharm the profits it expected from being the first entity to market a generic form of Paxil, which SmithKline allegedly entered into to retaliate against Torpharm for challenging SmithKline's monopoly. Another part of the scheme, allegedly, involved SmithKline fraudulently obtaining patents, improperly listing those patents, and engaging in sham patent litigation, all in an effort to prevent Torpharm and other generic drug manufacturers from competing in the paroxetine hydrochloride market. According to Torpharm, we should consider the anticompetitive effect of this scheme as a whole when we assess whether Torpharm has pled an antitrust injury.

■ In *Continental Ore Co. v. Union Carbide & Carbon Corp.*, the Supreme Court held that when an alleged antitrust conspiracy involves multiple acts, "[t]he character and effect of [that] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." 370 U.S. 690, 698, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (quotations omitted). Although *Continental Ore* was decided in the context of a motion for a directed verdict after trial, courts have applied the same reasoning when considering motions to dismiss anti-

---

9. We also find distinguishable *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.*, 579 F.2d 20 (3d Cir.1978), which Torpharm cites for the proposition that a monopolist can be liable under the antitrust laws for punishing an entity that challenges its monopoly. In that case, the defendant engaged in a variety of activities in an attempt to drive the plaintiff out of business after the plaintiff purchased products from a competitor of the defendant. *Id.* at 24. These activities included opening up a new plant to compete with the plaintiff, selling its product at a price below production cost, selling its product at lower prices at its new plant (which was close in proximity to the plaintiff) than at other plants, and extending credit to competitors of the plaintiff against the recommendations of the defendant's credit department. Without discussing antitrust injury, the court found that the combined effect of these activities was anticompetitive. *Id.* at 31. Torpharm fails to allege that SmithKline and PAR/Pentech engaged in similar anticompetitive acts in connection with the Settlement.

trust complaints. For example, in *Biovail Corp., Int'l v. Hoechst Aktiengesellschaft*, 49 F.Supp.2d 750 (D.N.J.1999), a federal district court considered a motion to dismiss an antitrust complaint filed by Biovail Corporation International ("Biovail"). The defendants (collectively referred to as "Hoechst") held an NDA for a drug marketed under the trademark "Cardizem." Biovail filed an NDA for a generic version of Cardizem, which was rejected allegedly due to the efforts of Hoescht. Biovail then filed an ANDA for a generic version of Cardizem; however, another generic drug manufacturer, Andrx Pharmaceuticals, Inc. ("Andrx"), was the first entity to file an ANDA for a generic version of Cardizem. Hoescht sued Andrx for patent infringement, thereby staying approval of its ANDA for a period of up to thirty months. Under the FDC Act, Andrx, as the first entity to file an ANDA for a generic version of Cardizem, was entitled to a 180–day period of market exclusivity within which it could market its drug without competition from subsequent ANDA applicants. The FDA could not approve Biovail's ANDA for a period of 180–days, such period commencing when either (1) Andrx began to commercially market its drug, or (2) a court decided that Hoescht's patents were either invalid or not infringed by Andrx, whichever was earlier. *Id.* at 755–58.

While Hoescht's patent infringement suit against Andrx was pending, the FDA gave Andrx tentative approval of its ANDA. That meant that Andrx could begin marketing its generic Cardizem product upon the expiration of the thirty-month stay. Doing so would commence Andrx's 180–day period of market exclusivity. Prior to the expiration of the stay, however, Andrx and Hoescht agreed to a partial settlement whereby Hoescht would pay Andrx quarterly payments of ten million dollars in exchange for Andrx's agreement not to market its product until the patent case, including appeals, was concluded. The effect of that settlement was to further delay approval of Biovail's ANDA. *Id.* at 758.

Biovail sued Hoescht for violations of the antitrust laws. It alleged that Hoesct engaged in a number of anticompetitive acts, including (1) improperly interfering with Biovail's NDA; (2) colluding with Andrx to postpone introduction of Andrx's generic product; (3) attempting to derail approval of Biovail's generic product in Canada; (4) threatening to sue Biovail for patent infringement despite the fact that it was prohibited from doing so by a Federal Trade Commission decree; and (5) asking Biovail to delay the marketing of its generic product in exchange for Hoescht refraining from suing Biovail for patent infringement. Hoescht took issue with each of these allegations and argued why each should be dismissed. The court rejected this approach:

> This court is troubled, however, by defendants' approach in light of the Supreme Court's clear mandate in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). In *Continental Ore*, the Court admonished the Court of Appeals for the Ninth Circuit for treating plaintiff's allegations regarding its antitrust claim "as if they were five completely separate and unrelated lawsuits."

*Id.* at 698–99, 82 S.Ct. 1404. The Court directed that: "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Id.* at 699, 82 S.Ct. 1404. In light of this directive, therefore, defendants' behavior will be evaluated, and all inferences will be drawn, in light of the allegations as a whole.

*Biovail,* 49 F.Supp.2d at 759–60. After considering the effect of Biovail's allegations as a whole, the court denied Hoescht's motion to dismiss. *Id.* at 772.

We now consider whether, in light of the Supreme Court's directive in *Continental Ore,* we can dismiss Torpharm's antitrust allegations to the extent they relate to the Settlement. First we will address Torpharm's Sixth Cause of Action, which alleges a conspiracy between SmithKline and PAR/Pentech to monopolize and/or restrain trade in the market for paroxetine hydrochloride. Then we will consider Torpharm's Fifth and Seventh Causes of Action, which allege that SmithKline monopolized the market for paroxetine hydrochloride, and that SmithKline and PAR/Pentech attempted to monopolize that market.

### 1. Torpharm's conspiracy claim

■ Torpharm's Sixth Cause of Action alleges a conspiracy between SmithKline and PAR/Pentech to monopolize and/or restrain trade in the market for paroxetine hydrochloride. Although *Continental Ore* requires that we consider the anticompetitive effect of this conspiracy as a whole, Torpharm still has "the burden of adequately alleging that a conspiracy to restrain trade existed in the first instance and that each defendant knowingly joined or agreed to participate in the conspiracy. If [Torpharm] fails to do so, ... *Continental Ore* [does not] shield [Torpharm's] claims from dismissal." *Jung v. Association of Am. Med. Colleges,* 300 F.Supp.2d 119, 161 (D.D.C.2004). In *Jung,* a federal district court considered a motion to dismiss antitrust claims brought by the plaintiffs, a class of medical school graduates currently or formerly enrolled in resident physician "residency" programs, against a group of organizations that administer graduate medical education in the United States, and a group of institutions that sponsor medical residency programs.

Though the court considered the plaintiffs' conspiracy allegations as a whole, it required the plaintiffs to adequately allege that each of the defendants participated in that conspiracy. When the court found the plaintiffs' conspiracy allegations against certain of the defendants "vague" and "conclusory," it dismissed the claims against those defendants. *See, e.g., id.* at 164; *see also Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 179–83 (3d Cir.1988) (affirming dismissal of antitrust conspiracy claims that were "conclusory").

Turning to the present case, we find that Torpharm has adequately alleged that SmithKline and PAR/Pentech entered into a conspiracy to monopolize and/or restrain trade in the market for paroxetine hydrochloride. That conspiracy was carried out through the Settlement, which, as we have discussed, did not produce an antitrust injury. Accordingly, Torpharm cannot maintain its antitrust conspiracy claims against SmithKline and PAR/Pentech unless the acts in furtherance of that conspiracy consist of something in addition to the Settlement, i.e., something that produced an antitrust injury.

While Torpharm has alleged that SmithKline engaged in certain other anticompetitive acts (namely, that it fraudulently obtained patents, improperly listed those patents, and engaged in sham patent litigation), Torpharm has failed to adequately alleged that PAR/Pentech conspired with SmithKline to participate in that scheme. Any such allegations are conclusory and must be rejected. Moreover, we would reject as irrational any allegation that PAR/Pentech entered into some larger conspiracy with SmithKline to prevent generic competition in the paroxetine hydrochloride market. We fail to see why PAR/Pentech, a generic drug manufacturer who, until the Settlement, was being sued by SmithKline for infringement of its

paroxetine-related patents, would agree with SmithKline prior to the Settlement to help delay generic competition in the paroxetine hydrochloride market. We may dismiss antitrust allegations that require irrational inferences. *See, e.g., DM Research, Inc. v. College of Am. Pathologists,* 170 F.3d 53, 56–57 (1st Cir.1999) (affirming dismissal of a complaint that alleged an antitrust conspiracy between two defendants under circumstances that were "implausible"); *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1109 (7th Cir. 1984) (affirming dismissal of antitrust complaint because "it is inherently implausible that Ford, as a buyer that could 'dictate[ ] and control[ ]' the tariffs of its suppliers of transportation services, would conspire in order to allow its new carrier, Nu–Car, to charge noncompetitive prices; the plaintiffs are alleging, in essence, that Ford conspired to injure itself"). We are left, then, with an alleged conspiracy between SmithKline and PAR/Pentech that consisted entirely of those two entities agreeing to the Settlement. Because the Settlement did not produce an antitrust injury, we are compelled to dismiss Torpharm's antitrust conspiracy claim.

### 2. Torpharm's monopolization and attempted monopolization claims

■ We reach a different conclusion with respect to Torpharm's Fifth and Seventh Causes of Action, its monopolization and attempted monopolization claims. SmithKline and PAR/Pentech have moved to dismiss these claims to the extent they are based on the Settlement. Although *Continental Ore* addressed antitrust conspiracy claims, subsequent cases have applied the rule from that case to monopolization and attempted monopolization claims. *See, e.g., LePage's,* 324 F.3d at 162. Thus, as with the conspiracy claims, the "[t]he relevant inquiry is the anticompetitive effect of [SmithKline's and PAR/Pentech's] exclusionary practices considered together." *Id.*

■ With respect to SmithKline, we are compelled to conclude that *Continental Ore* precludes us from dismissing Torpharm's monopolization and attempted monopolization claims to the extent they are based on the Settlement. Though we have found that the Settlement did not produce an antitrust injury, Torpharm alleges that SmithKline entered into the Settlement as part of a larger scheme to maintain its monopoly in the market for paroxetine hydrochloride. (*E.g.,* Counterclaim ¶ 408.) Because we must consider the anticompetitive effect of SmithKline's acts as a whole, *see LePage's,* 324 F.3d at 162, we cannot conclude as a matter of law that those acts did not produce an antitrust injury.[10] *See Biovail,* 49 F.Supp.2d. at 772 ("The injury alleged—the intention-

10. SmithKline argues that in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court did precisely what SmithKline is asking us to do here, that is, dismiss certain antitrust conspiracy allegations when those allegations failed to allege an antitrust injury. We disagree. *Matsushita* was decided in the context of a motion for summary judgment, and SmithKline has not cited us to any case that applied *Matsushita* in the way SmithKline advocates, nor have we found such a case. Moreover, in *Matushita,* the Supreme Court did not, as SmithKline suggests, "carve[ ] out and dismiss[ ] the portion of an alleged conspiracy that did not produce 'antitrust injury.'" (Doc. No. 128 at 6.) Rather, the Supreme Court considered each piece of evidence that the plaintiffs offered in support of their antitrust conspiracy theory and found that the evidence, as a whole, did not raise a genuine issue of material fact that supported the plaintiffs' theory. *Matsushita,* 475 U.S. at 588–98, 106 S.Ct. 1348. Here, in contrast, while we have concluded that the Settlement did not produce an antitrust injury, we cannot conclude that SmithKline's actions as a whole did not produce such an injury.

al attempt to exclude competitors from the market and maintain monopoly power—is precisely the type of injury that the antitrust laws were intended to prevent.").[11] We note, however, that even though we cannot dismiss Torpharm's monopolization and attempted monopolization claims against SmithKline to the extent they are based on the Settlement, Torpharm, assuming it proves its claims, will not be able to recover from SmithKline the profits it allegedly lost when it was denied the "right" to be the first entity to market a generic form of Paxil. That is not an "injury of the type the antitrust laws were intended to prevent...." *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690. Torpharm's damages must "flow[ ] from that which makes [SmithKline's] acts unlawful," i.e., its alleged attempt to monopolize and restrain competition in the market for paroxetine hydrochloride. *Id.*

■ With respect to Torpharm's attempted monopolization claim against PAR/Pentech, we are compelled to dismiss that claim. The only act that PAR/Pentech allegedly took in its attempt to monopolize the market for paroxetine hydrochloride was entering into the Settlement. That act did not produce an antitrust injury. In dismissing Torpharm's attempted monopolization claim against PAR/Pentech, we are not ignoring the Supreme Court's mandate in *Continental Ore.* We have considered the anticompetitive effect of PAR/Pentech's acts as a whole. However, the only act that Torpharm attributes

to PAR/Pentech was its Settlement with SmithKline. Accordingly, we are compelled to dismiss Torpharm's attempted monopolization claim against PAR/Pentech.

## C. Torpharm's Claims of Tortious Interference

■ Finally, we turn to Torpharm's Eighth Cause of Action, tortious interference with Torpharm's prospective economic advantages, alleged against SmithKline and PAR/Pentech. To state a claim for tortious interference with prospective economic advantages, a plaintiff must allege: (1) the existence of a prospective contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to prevent the prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; (4) the occasioning of actual legal damage as a result of the defendant's conduct; and (5) a reasonable likelihood that the relationship would have occurred but for the interference of the defendant. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 530 (3d Cir.1998) (citing *Pelagatti v. Cohen,* 370 Pa.Super. 422, 536 A.2d 1337, 1343 (Pa.Super.1988)).

■ Most of Torpharm's allegations of tortious interference with prospective economic advantages are based on SmithKline's and PAR/Pentech's interference with Torpharm's purported right to a 180–day period of exclusivity within which

---

11. We note that in *Biovail,* the court expressed some doubt whether certain of Biovail's allegations actually alleged an injury, yet still denied Hoescht's motion to dismiss based on the court's conclusion that Biovail's monopolization and attempted monopolization claims as a whole alleged an injury. *See Biovail,* 49 F.Supp.2d. at 771 ("Again, regardless of whether Biovail suffered injury from that proposal, and in light of the other allegations, the fact—if fact it be—that the proposal

was made could well provide support for Biovail's assertion that defendants unreasonably restrained trade or were wilfully attempting to obtain or maintain a monopoly."). Similarly, here, we are compelled to deny SmithKline's motion to dismiss Torpharm's monopolization and attempted monopolization claims to the extent they are based on Settlement even though we have found that the Settlement, by itself, did not produce an antitrust injury.

Torpharm intended to market a generic form of Paxil free from competition. (Counterclaim ¶¶ 430–38, 440.) As we have explained, Torpharm had no such right; its only right under the FDC Act as the first entity to file an ANDA for a bioequivalent form of Paxil was the right to market its generic alternative for 180 days free from competition *from other ANDA applicants. See* 21 U.S.C. § 355(j)(5)(B)(iv); *Eon Labs,* 164 F.Supp.2d at 362. SmithKline did not violate this right when it licensed to PAR/Pentech the right to sell paroxetine hydrochloride hemihydrate under Smith-Kline's NDA. As a result, to the extent Torpharm's claims are based on Smith-Kline's and PAR/Pentech's tortious interference with its purported right to 180 days of market exclusivity, those claims must be dismissed as they do not allege the existence of a prospective contractual relation between Torpharm and a third party.[12]

██ Torpharm also alleges that Smith-Kline tortiously interfered with its prospective economic advantages when it brought a sham patent infringement suit against Torpharm, thereby delaying Torpharm's entry into the generic Paxil market. (Counterclaim ¶¶ 439, 441.) With respect to these claims, we are compelled to deny SmithKline's Motion to Dismiss. Torpharm's allegation that SmithKline brought a sham patent infringement suit against Torpharm with the purpose of keeping it out of the generic Paxil market is sufficient to state a claim for tortious interference with prospective economic advantages. *See, e.g., Zenith Labs., Inc. v. Abbot Labs.,* No. 96–1661, 1996 WL 33344963, at *6 (D.N.J. Aug.7, 1996). Such conduct, being wrongful and independently actionable, is not protected by the

competitor's privilege. *See Brokerage Concepts,* 140 F.3d at 530–31 (declining to decide whether a tortious interference plaintiff needs to allege independently actionable conduct in order to defeat the competitor's privilege, but noting that the Restatement (Second) of Torts defines "wrongful means" to include "fraud") (citing RESTATEMENT (SECOND) OF TORTS § 767, cmt. c (1979)); *Patient Transfer Sys., Inc. v. Patient Handling Solutions, Inc.,* No. 99–1568, 1999 WL 1212189, at *4 (E.D.Pa. Dec.17, 1999) (holding that "wrongful means" includes "conduct that is independently actionable") (citing *DP–Tek, Inc. v. AT & T Global Info. Solutions Co.,* 100 F.3d 828, 833–35 (10th Cir.1996)). Accordingly, we will deny SmithKline's Motion to Dismiss Torpharm's tortious interference claims to the extent those claims are based on SmithKline filing a sham patent infringement suit against Torpharm.

## III. CONCLUSION

For the foregoing reasons, the Motions to Dismiss are granted in part and denied in part. Torpharm's antitrust conspiracy claim, its Sixth Cause of Action, is dismissed. Torpharm's tortious interference claim, its Eighth Cause of Action, is dismissed against PAR/Pentech in its entirety, and dismissed against SmithKline to the extent those claims are based on Torpharm's purported right to a 180–day period of market exclusivity. Torpharm's attempted monopolization claim, its Seventh Cause of Action, is dismissed as to PAR/Pentech. Our decision means that PAR/Pentech is dismissed as a counterclaim defendant from this case.

**12.** Since all of Torpharm's claims of tortious interference with prospective economic advantages against PAR/Pentech are based on

this purported "right," those claims against PAR/Pentech are dismissed in their entirety.